Harold BROOKS, Angie Brooks, and James Brooks, Appellants,

v.

**CENTER FOR HEALTHCARE SERVICES a/k/a Crisis Center, Appellee.**

No. 04–97–00353–CV.

Court of Appeals of Texas, San Antonio.

June 30, 1998.

Randy Gathany, David W. Rogers, Law Offices of Dave Rogers, Inc., San Antonio, for Appellant.

James B. Edwards, William G. Trulove, Edwards & Associates, Houston, Jacqueline L. Murry-Molden, Assistant Attorney General, Austin, for Appellee.

Before HARDBERGER, C.J., and RICKHOFF and DUNCAN, JJ.

## OPINION

RICKHOFF, Justice.

James Brooks and his parents, Harold and Angie, sued the Center for Healthcare Services (the Crisis Center), alleging that James was injured while he was at the Crisis Center for emergency mental health treatment. They sought damages under the Texas Tort Claims Act and the Civil Rights Act of 1871. The trial court granted summary judgment in favor of the Crisis Center on both causes of action.[1]

The principal issue we must address is whether the Crisis Center is subject to liability under the Civil Rights Act. Because the Center is more like a local governmental entity than an arm of the state, we conclude that it is subject to such liability. We also conclude that issues of fact exist on the

Brookses' Civil Rights Act claim, as well as their claim under the Texas Tort Claims Act. Therefore, we reverse the summary judgment and remand for trial.

### STANDARD OF REVIEW

We review a summary judgment *de novo. See Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 602 (Tex.App.—San Antonio 1995, writ denied). We will uphold a summary judgment only if the record establishes that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *See* TEX.R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Travis v. City of Mesquite*, 830 S.W.2d 94, 99–100 (Tex.1992); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). When, as here, a trial court's order granting summary judgment does not specify the ground or grounds relied on for the ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *See Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

A defendant who conclusively establishes all of the elements of an affirmative defense is entitled to summary judgment. *See Cathey*, 900 S.W.2d at 341. Once a movant establishes its right to summary judgment on the basis of an affirmative defense, the nonmovant must respond with reasons for avoiding summary judgment and must support those reasons with proof sufficient to raise a fact issue. *See Cummings v. HCA Health Servs.*, 799 S.W.2d 403, 405 (Tex.App.—Houston [14th Dist.] 1990, no writ). If the nonmovant responds with proof of a basis for avoiding the movant's affirmative defense, the movant then has the burden to negate the plaintiff's ground for avoidance as a matter of law. *See id.*

### SUMMARY JUDGMENT ON CLAIMS UNDER THE TORT CLAIMS ACT

#### *Governmental Liability Under the Tort Claims Act*

The Tort Claims Act provides:

Center's motion for summary judgment, the trial court severed the causes of action against the Crisis Center from the causes of action against the remaining defendants.

---

1. The Brookses also sued the San Antonio State Hospital and Jana Toy, M.D., for injuries James suffered after he was transported from the Crisis Center to the hospital. After granting the Crisis

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.021 (Vernon 1997). The Brookses assert that section 101.021(2) applies in this case. The supreme court has held that for immunity to be waived under section 101.021(2), "personal injury or death must be proximately caused by a condition or use of tangible personal or real property." *Dallas County Mental Health & Mental Retardation Ctr. v. Bossley*, 968 S.W.2d 339, 342 (1998). Additionally, a government entity may only be held liable under section 101.021 for the negligence of its employees. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.057(2) (Vernon 1997); *Dumas v. Muenster Hosp. Dist.*, 859 S.W.2d 648, 650 (Tex.App.—Fort Worth 1993, no writ).

### The Summary Judgment Motion and Evidence

After the Brookses filed their first amended petition, the Crisis Center moved for summary judgment on the ground that sovereign immunity barred the Brookses' cause of action under the Tort Claims Act. Specifically, the Crisis Center asserted: 1) the Brookses' petition contained judicial admissions demonstrating that their cause of action under the Tort Claims Act was barred, and 2) the Brookses could not produce any evidence showing that the Crisis Center waived its sovereign immunity. The Crisis Center at-

tached to its motion the affidavit of its contracts manager, stating that the Crisis Center is organized and operated under sections 531.002 and 534.001 of the Texas Health and Safety Code. This affidavit is the only summary judgment evidence submitted by the Crisis Center.

In response to the Crisis Center's motion, the Brookses amended their petition. They also filed a response to the summary judgment motion, in which they asserted that their amended petition did not contain any judicial admissions that would defeat their causes of action, and that the Crisis Center's sovereign immunity is waived for their claims of personal injury caused by the condition or use of personal and real property. Attached to the Brookses' response was James's affidavit, which states:

I was put in a small room where I was not restrained until after I had injured myself on the mirror in the room. I was injured when I broke a reflecting mirror in the small room at the Crisis Center. From the time I was put into the room, no one checked on me until after the mirror was broken. The primary cause of my injury at that time was that I was allowed to remain unsupervised for an extended period of time, despite the fact that there was a window in the door to my room which could have been used for convenient supervision. Then I was further injured as I had my body ground into the pieces of glass on the floor and was beat up when agents of the Crisis Center put me in restraints. However, I removed the wrist restraints with my teeth when I was again unsupervised.

The injuries I suffered include but are not limited to a chipped tooth, the cracking of my hip, or aggravation of an existing crack, bruises, cuts and abrasions and mental health injuries each as a direct and proximate cause of the agents of the Crisis Center using excessive force in restraining me and the use or misuse of restraint devices and the holding room itself.

Attached to the affidavit were pictures of the property, including restraints and a room containing a bed and mirror, that James claimed was used or misused. James's affi-

**283**

davit and the accompanying pictures were the only summary judgment evidence submitted by the Brookses.

### Judicial Admissions

Generally, pleadings do not constitute summary judgment proof. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). But if a plaintiff's pleadings contain judicial admissions negating the cause of action, summary judgment may properly be granted on the basis of the pleadings. *See Texas Dep't of Corrections v. Herring*, 513 S.W.2d 6, 9 (Tex.1974). Judicial admissions are "[a]ssertions of fact, *not pled in the alternative*, in the *live* pleadings of a party." *Houston First American Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983) (emphasis added). Unlike statements in live pleadings, statements contained in superseded pleadings are not conclusive and indisputable judicial admissions. *See Sosa v. Central Power & Light*, 909 S.W.2d 893, 895 (Tex.1995); *see also Johnson v. Rollen*, 818 S.W.2d 180, 183 (Tex.App.—Houston [1st Dist.] 1991, no writ) (fact that a plaintiff files an amended petition after a summary judgment motion is filed does not change the defendant's summary judgment burden to establish its entitlement to summary judgment on all issues raised by the live pleadings).

As noted above, the Brookses amended their petition after the Crisis Center filed its motion for summary judgment. The Brookses therefore argue that the summary judgment cannot be upheld on the basis that statements in the earlier petition constituted judicial admissions, because those statements were no longer part of a live pleading. The Crisis Center acknowledges that the amended petition superseded the earlier petition, but it argues that the amended petition left most of the judicial admissions substantially intact.

The Brookses alleged in both their first amended petition and their second amended petition that the Crisis Center put James in a room where he was susceptible to injury without taking precautions to protect him from himself and the intentional behavior of Crisis Center employees and that Crisis Center employees used hand and leg restraints, clubs, and other weapons to restrain James in violation of his constitutional right to due process. The Crisis Center argued in its motion for summary judgment that the Brookses' allegations of constitutional violations and intentional conduct operated as judicial admissions barring their recovery under the Tort Claims Act, which only subjects governmental units to liability for its employees' negligent behavior. Although the Brookses attempted to allege constitutional violations involving intentional conduct, they alternatively alleged that Crisis Center employees acted negligently. For example, the Brookses' petition stated that Crisis Center employees inflicted severe injury on James, with "such infliction of injury either being negligent in violation of state law, or intentional in accord with the policies or customs of the Defendant and in violation of the Plaintiff's civil rights." Because the allegations regarding intent were pled in the alternative, they do not constitute judicial admissions. *See Musick*, 650 S.W.2d at 767. We therefore conclude the summary judgment could not properly be based on the theory that the Brookses judicially admitted they did not have a Tort Claims Act cause of action against the Crisis Center.

### The Affidavits

The Brookses also argue that the summary judgment cannot be upheld on the ground that they failed to raise a fact issue regarding the Crisis Center's waiver of its sovereign immunity. The Crisis Center responds that it established its sovereign immunity through the affidavit attached to its summary judgment motion. The Crisis Center asserts that the burden then shifted to the Brookses to demonstrate that they have a claim cognizable under the Tort Claims Act and to create a fact question regarding whether the Crisis Center waived its immunity.

We agree with the Crisis Center that the affidavit attached to its summary judgment motion established its entitlement to the protections afforded by sovereign immunity. The affidavit stated that the Crisis Center is organized and operated under section 534.001 of the Texas Health and Safety Code, which

provides that such a center is "an agency of the state, a governmental unit, and a unit of local government, as defined and specified by Chapters 101 and 102, Civil Practice and Remedies Code [which contain the Tort Claims Act]." TEX. HEALTH & SAFETY CODE ANN. § 534.001(c)(1) (Vernon Supp.1998). The affidavit thus shifted the burden to the Brookses to come forward with evidence that the Crisis Center's sovereign immunity was waived by the Tort Claims Act. *See Vela v. City of McAllen,* 894 S.W.2d 836, 839 (Tex. App.—Corpus Christi 1995, no writ). We must look to the summary judgment evidence to determine whether the Brookses satisfied this burden.

James's assertions that the Crisis Center failed to supervise or restrain him do not create a fact question regarding waiver of sovereign immunity under section 101.021(2) because they involve the mere nonuse of property. Section 101.021(2) does not subject governmental units to liability for the nonuse of property. *See Bossley,* 968 S.W.2d at 343; *Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 584–85 (Tex.1996).[2] James also claims in his affidavit that he was injured when agents of the Crisis Center used hand and leg restraints in an attempt to restrain him. The Crisis Center argues this statement does not create a fact issue precluding summary judgment because it does not expressly recite that James's injuries resulted from the acts of employees of the Crisis Center. According to the Crisis Center, James's description of these persons as "agents" of the Crisis Center is not sufficient to create a fact question. The Crisis Center would require James to use the word "employee" or supply the names of the negligent persons. Imposing such a requirement, however, would be inconsistent with summary judgment practice.

 In deciding whether there is a disputed fact issue precluding summary judgment, we must resolve every reasonable inference in the nonmovant's favor. *See Nixon,* 690 S.W.2d at 548–49. Under

the Tort Claims Act, "agent" can mean "employee." See TEX. CIV. PRAC. & REM. CODE § 101.001(2) (Vernon Supp.1998). James's statement that he was restrained by Crisis Center agents is thus sufficient to create a fact question regarding whether these persons were employees of the Crisis Center. *See Murphy v. Galveston County,* 788 S.W.2d 938, 939 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (bare statement that negligent party was county officer or official was a factual conclusion, sufficient to create a summary judgment issue under section 101.021(2)). Accordingly, the summary judgment could not properly be based on the theory that the Brookses failed to raise a fact question regarding the Crisis Center's liability under the Tort Claims Act.

### SUMMARY JUDGMENT ON CLAIMS UNDER THE CIVIL RIGHTS ACT

#### *Governmental Liability Under the Civil Rights Act*

 Under 42 U.S.C. § 1983, local government units may be held liable for the deprivation of federal constitutional rights. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But states and entities that may be characterized as arms of the state for purposes of the Eleventh Amendment may not be held liable under § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Mere negligence does not give rise to a § 1983 claim. *See Daniels v. Williams,* 474 U.S. 327, 331–334, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

#### *The Summary Judgment Motion and Evidence*

The Crisis Center argued in its motion for summary judgment that it is not a proper party to a § 1983 claim because it is a state agency. It relied on its contract manager's affidavit, which stated:

---

**2.** Although not addressed in James's affidavit, the Crisis Center also argues that the Brookses' allegation that the Crisis Center failed to record certain information in James's medical chart is

not a cognizable claim under the Tort Claims Act. We agree. *See University of Texas v. York,* 871 S.W.2d 175, 178–79 (Tex.1994). The Brookses have not argued otherwise on appeal.

The Center ... is organized and operated under the auspices of Title 7 of the Texas Health and Safety Code, Sections 531.002 and 534.001.

Specifically, the Center ... is a community center which submits a yearly plan to the Texas Department of Mental Health and Mental Retardation (TDMHMR) in conjunction with renewing its contract for mental health/mental retardation services with TDMHMR. .... TDMHMR reviews the Center's plan to develop and make available to Bexar County's residents effective mental health/mental retardation services yearly in connection with this contract renewal. By approving contract renewal, TDMHMR approves the Center's plan and determines the Center can appropriately, effectively and efficiently provide those services in the region.

Moreover, the Center ... is not operated to make a profit. It was originally created by an intergovernmental agreement, executed January 11, 1974, between the community center and: the City of Olmos Park, the City of San Antonio, the City of Castle Hills, the City of Alamo Heights, San Antonio Independent School District, Edgewood Independent School District and Bexar County. The Center ... currently maintains service contracts with Bexar County, the City of San Antonio, San Antonio Independent School District and Edgewood Independent School District.

The Crisis Center also asserted that the Brookses' § 1983 claim was merely a negligence claim disguised as a constitutional tort.

### Arm–of–the–State Analysis

As demonstrated by the affidavit attached to its motion, the Crisis Center was established pursuant to chapter 534 of the Health and Safety Code. That chapter provides for the establishment of community mental health centers. See TEX. HEALTH & SAFETY CODE ANN. § 534.001 (Vernon 1992 & Supp. 1998). Such a community center is deemed to be "an agency of the state, a governmental unit, and a unit of local government," as those terms are used in the Tort Claims Act. Id. § 534.001(c)(1) (Vernon Supp.1998). The Crisis Center asserts that because communi-

ty centers are defined as state agencies for purposes of the Tort Claims Act, they may not be held liable under § 1983.

In considering this argument, we first note that section 534.001(c)(1) describes a community center as both "an agency of the state" and "a unit of local government." Because local governments, but not state agencies, have § 1983 liability, section 534.001(c)(1) does not assist us in resolving the issue before us. The purpose of section 534.001(c)(1), as demonstrated by its reference to the Tort Claims Act, is to subject community centers to the limited waiver of sovereign immunity set forth in the Tort Claims Act. But an entity's § 1983 liability does not hinge on the extent of its sovereign immunity from state tort suits; § 1983 liability hinges instead on whether the entity may be characterized as an arm of the state for purposes of the Eleventh Amendment. See Howlett v. Rose, 496 U.S. 356, 376, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); Will, 491 U.S. at 70, 109 S.Ct. 2304; see also San Antonio Indep. Sch. Dist. v. McKinney, 936 S.W.2d 279, 283 (Tex.1996) (fact that an entity enjoys sovereign immunity does not mean it is in effect the state for purposes of the Eleventh Amendment). Whether the Eleventh Amendment applies is question of federal law. See Howlett, 496 U.S. at 376, 110 S.Ct. 2430; McKinney, 936 S.W.2d at 281–82.

Although the Supreme Court has yet to develop a definitive test for determining whether the Eleventh Amendment applies, we are not without guidance in making this determination. The lower federal and state courts most often turn to two Supreme Court decisions when conducting an arm-of-the-state analysis.

In the first case, the Court had to determine whether a local school board was an arm of the State of Ohio. See Mt. Healthy City Sch. Dist.. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To make that determination, the Court first examined how local school boards were characterized under state law. It noted that under Ohio law, the term "State" did not include local school districts. See id. at 280, 97 S.Ct. 568. The Court next recognized

that local school boards were subject to some guidance from the state and received "significant" amounts of money from the state, but it also observed that they had extensive powers to issue bonds and levy taxes. *Id.* The Court concluded that local school boards were not entitled to Eleventh Amendment immunity because "[o]n balance," they were "more like a county or city than ... like an arm of the State." *Id.* at 280–81, 97 S.Ct. 568.

In the second case, the Court determined that a planning agency created by an interstate compact was not an arm of the state. *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). The Court noted that the agency was designated in the compact as a separate legal entity, the majority of its governing members were appointed by counties rather than the states, the agency was exclusively funded by the counties, the compact expressly stated the agency's obligations were not binding on the states, the agency's purpose related to local concerns, and the states did not have veto power over rules and regulations promulgated by the agency. *See id.* at 401–02, 99 S.Ct. 1171.

Construing *Mt. Healthy* and *Lake Country Estates,* the lower federal and state courts have derived a hodgepodge of multipart tests for determining whether the Eleventh Amendment applies. *See* Alex E. Rogers, Note, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm–of–the–State Doctrine,* 92 COLUM. L.REV. 1243, 1269–71 (1992) (describing the various tests). Our own supreme court appears to have adopted a two-pronged test: 1) the "legal and functional nature" of the entity under Texas law, and 2) whether "a judgment against the entity would in effect be a judgment against the State." *McKinney,* 936 S.W.2d at 282–83. We also find persuasive two decisions of the Fifth Circuit Court of Appeals. *See Farias v. Bexar County Bd. of Trustees for Mental Health & Mental Retardation Servs.,* 925 F.2d 866 (5th Cir.1991); *Wheeler v. Mental Health & Mental Retardation Auth.,* 752 F.2d 1063 (5th Cir.1985). In *Farias* and *Wheeler,* the court determined that two local mental health agencies created under the predecessor to chapter 534 of the Health and Safety Code were not entitled to Eleventh Amendment immunity from § 1983 actions. *See Farias,* 925 F.2d at 874–75; *Wheeler,* 752 F.2d at 1072–73.

Using these cases as our guide, we will first examine state law to determine the legal and functional nature of a community center. *See McKinney,* 936 S.W.2d at 282. The legislature has provided that only counties, municipalities, hospital districts, school districts, or a combination of these "local agencies" may establish and operate a community center. TEX. HEALTH & SAFETY CODE ANN. § 534.001(a) (Vernon 1992). This is reflected in the Crisis Center's affidavit, which states the Crisis Center was created by a combination of local government units. The Crisis Center was thus created by local, not state, initiative. A community center must also be administered by a local board of trustees, who must be either members of a governing body of an entity that created the center or residents of the region to be served by the center. *See id.* §§ 534.002, .003, .008 (Vernon 1992 & Supp.1998); *see also Lake Country Estates,* 440 U.S. at 401, 99 S.Ct. 1171; *Farias,* 925 F.2d at 875; *Wheeler,* 752 F.2d at 1072 (considering these factors important).

Although community centers are locally governed, the Texas Department of Mental Health and Mental Retardation has some control over the centers. The Department is required to assist and advise community centers. *See* TEX. HEALTH & SAFETY CODE ANN. § 534.013 (Vernon 1992). The Department may also conduct periodic program reviews and management audits. *See id.* §§ 534.035, .037 (Vernon Supp.1998). According to the Crisis Center's affidavit, the Department reviews the Center's yearly plan for providing services.

The affidavit provides no information concerning the Crisis Center's fiscal or financial status. By statute, it appears that community centers have considerable financial independence from the state. A community center must annually provide to the local entities that support it a copy of its operating budget, most recent financial audit, and staff salaries.

*See id.* § 534.014(a). Community centers also submit annual requests for funds to the sponsoring local entities, and the local entities may contribute land, facilities, and personnel to administer the center's programs. *See id.* §§ 534.014(b), .019. A community center may accept gifts and grants for providing services. *See id.* § 534.018. Community centers have the discretion to set reasonable fees for their services to nonindigent clients, but they have the same powers for collecting fees as the Department has by law. *See id.* § 534.017 (Vernon 1992 & Supp.1998). A community center may purchase or lease real and personal property and may construct buildings and facilities. *See id.* § 534.020 (Vernon Supp.1998); *see also McKinney,* 936 S.W.2d at 282 (considering this factor in concluding independent school district was not arm of the state). To finance these projects, a community center may issue bonds or notes. *See* TEX. HEALTH & SAFETY CODE ANN. § 534.022; *see also Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568; *McKinney,* 936 S.W.2d at 282 (considering this factor important). Although the Department may also construct or renovate a community center, the center must repay the Department with interest. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 534.023, .024, .026 (Vernon 1992 & Supp.1998). A community center may use state funds to operate facilities constructed by the Department, but the total amount of state funds used may not exceed an amount equal to 60% of the facility's total operating budget. *See id.* § 534.030(a) (Vernon Supp. 1998). The Department may conduct financial audits of community centers. *See id.* § 534.036.

 Based on these statutes and the limited summary judgment evidence, we conclude that the Crisis Center, while subject to some state control, is more like a local government unit than an arm of the state. Although the statutes indicate that at least some community centers receive substantial state funding, that fact is not sufficient to make the Crisis Center an arm of the state. The Supreme Court determined that a local school board was not an arm of the state even though it received a "significant" amount of money from the state. *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568. And

the Texas Supreme Court has held that "[f]or Eleventh Amendment purposes, it is not the entity's mere receipt of state funds that is important, but whether a money judgment against the entity must be paid with state funds." *McKinney,* 936 S.W.2d at 284. An entity cannot establish this fact merely by showing that a judgment against it would be paid with funds initially appropriated to the entity by the State of Texas because "the Eleventh Amendment is not concerned with tracing the source of funds . . .; [r]ather, [it] precludes actions against a state agency that must be paid from the state's treasury." *Id.* In this case, there is no indication, either in the statutes or in the summary judgment evidence, that a judgment against the Crisis Center would be paid from Texas's treasury. *See Farias,* 925 F.2d at 875 ("The failure of evidence as to where funds will come from to pay an adverse judgment is a controlling factor."). We therefore conclude that the Crisis Center is not arm of the state for purposes of the Eleventh Amendment. Consequently, the summary judgment could not properly be based on the theory that the Crisis Center is not a proper party to a § 1983 cause of action.

### Disguised Negligence Claim

The Crisis Center alternatively argues that the Brookses' allegations do not constitute a valid claim under § 1983 because they are merely negligence allegations disguised as a constitutional tort. According to the Crisis Center, the Brookses only true cause of action is one for medical malpractice, which is not cognizable under § 1983. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Mitchell v. Amarillo Hosp. Dist.,* 855 S.W.2d 857, 867–69 (Tex.App.—Amarillo 1993, writ denied) (holding that medical malpractice claim, however characterized, is not cognizable under § 1983 and that plaintiffs failed to state a claim under § 1983 based on a hospital's practice of allowing nurses to administer anesthesia); *Godinet v. Thomas,* 824 S.W.2d 632, 633

(Tex.App.—Houston [14th Dist.] 1991, writ denied) (holding that plaintiff failed to state a § 1983 claim based on accidental needle puncture).

The Brookses' pleadings, however, go beyond mere negligence allegations. They pled that James's injuries resulted either from the Crisis Center's negligent conduct or its intentional conduct. Moreover, James's affidavit does not establish, as matter of law, that Crisis Center employees had only a negligent mental state. As the Brookses conceded in their summary judgment response, they cannot properly recover on the theory that certain conduct was both negligent under the Tort Claims Act and intentional under § 1983. At the summary judgment stage, however, we only determine whether a fact issue exists regarding these alternate causes of action. We conclude that such a fact issue does exist. *See RRR Farms, Ltd. v. American Horse Protection Ass'n,* 957 S.W.2d 121, 132 (Tex.App.—Houston [14th Dist.] 1997, pet. denied) (summary judgment should not be granted when the issues are inherently those for a jury, as with cases involving intent); *Cf. Harrison v. Texas Dep't of Criminal Justice,* 915 S.W.2d 882, 889 (Tex.App.—Houston [1st Dist.] 1995, no writ) (§ 1983 claim was not rendered frivolous by fact that petition also alleged negligence under the Tort Claims Act).

### CONCLUSION

Having concluded that none of the grounds in the Crisis Center's motion were sufficient to entitle the Crisis Center to summary judgment, we reverse the summary judgment and remand this matter for further proceedings.