LEXINGTON INSURANCE COMPANY, Appellant,

v.

BUCKINGHAM GATE, LTD., INC., Appellee.

No. 13–97–813–CV.

Court of Appeals of Texas, Corpus Christi.

March 25, 1999.

Rehearing Overruled July 1, 1999.

Thomas C. Wright, John L. Dagley, Campbell Harrison & Wright, William L. Burnett, Thornton & Burnett, Houston, for Appellant.

E. John Gorman, Attorney at Law, Bradford W. Irelan, Irelan & Associates, Houston, for Appellee.

Before Justices DORSEY, HINOJOSA, and RODRIGUEZ.

## OPINION

Opinion by Justice DORSEY.

Buckingham Gate, Ltd., Inc. sued its insurer, Lexington Insurance Company, for violations of the DTPA and article 21.21 of the Texas Insurance Code after it refused to pay a claim under an "all-risks" insurance policy. The jury answered special questions favorable to Buckingham, and the trial court rendered a judgment against Lexington for $1,703,825, plus $318,255 in prejudgment interest. Lexing-

ton brings eight issues for our consideration, and Buckingham brings three issues. We reverse and render.

Ferromet Resources, Inc. was a company that bought surplus-and-used stainless steel and sold it to steel mills in Europe and the Far East, shipping by sea. This required warehouses and a dock on the Houston Ship Channel. Larry Whyte, the head of Ferromet, formed Buckingham Gate, Ltd., Inc. for the purpose of buying the needed property. On December 31, 1987, Buckingham paid $2.6 million for approximately fourteen acres of land, which included two docks on the Houston Ship Channel. Buckingham leased one of the docks to Ferromet at $25,000 per month for five years and the other dock to Schroeder Marine. This suit centers solely on the Ferromet dock.

In the fall of 1988, several insurance brokers, including Adams & Porter, contacted Ferromet to sell it insurance. Scott Breimeister, Ferromet's vice-president and chief financial officer, asked these brokers to evaluate Ferromet's current insurance coverage and make a proposal. Adams & Porter advised Breimeister that they were experts in marine insurance and that they would evaluate his insurance needs. Breimeister explained to John Hilliard, an Adams & Porter insurance agent, the importance of the docks and that he wanted complete coverage for both docks.

Adams & Porter submitted Buckingham's insurance risk to the market. Lexington, through its underwriting arm, Southern Risk Specialists, Inc., (Southern Risk) sold an "all-risks" property insurance policy to Buckingham and Ferromet, the named insureds. Southern Risk sent the policy to Hilliard for him to review. John Lewis, a senior vice-president at Adams & Porter, also reviewed the policy at Hilliard's request. Hilliard sent it to Breimeister, after he and Lewis had reviewed the policy.

The original policy as issued excluded coverage of the docks, but Southern Risk corrected the problem by issuing a policy

endorsement covering them. While the policy was in effect, Ferromet employees noticed a depression in the soil behind the dock. Sonny Flores, a civil engineer, inspected the dock and found that the bulkhead wall behind the dock had failed, the concrete beams and slabs between the abutment wall were damaged, and the dock on the downstream side had moved substantially. He encouraged Buckingham to replace the dock.

Buckingham gave Lexington its initial notice of the loss on February 7, 1990. The cause of the loss was stated as "freeze." However the policy did not cover the docks against loss caused by freezing or thawing.

After Buckingham gave its notice of the loss, Jim Wiethorn, an engineer, also inspected the Ferromet dock at Lexington's request. Flores advised him that the cause of the loss was an extremely low tide which acted to reduce the resisting capacity of the dock's retaining wall thereby contributing with other factors to allow wall movement.

By letter dated April 30, 1990, Lexington's counsel advised Buckingham's counsel that Lexington had made a preliminary determination that the policy did not provide coverage for the damages claimed. In July 1990 Ferromet sued Lexington in state district court, and Lexington removed the case to federal court claiming jurisdiction based upon diversity of citizenship. In early 1992 Buckingham submitted its proof of loss, and on March 11, 1992, Ferromet and Buckingham filed this lawsuit against Lexington and Adams & Porter, alleging coverage and, if not, violations of the DTPA and article 21.21 by misrepresenting coverage under the policy. Ferromet dismissed its suit in federal court against Lexington.

On May 4, 1992, Lexington's counsel sent Buckingham's counsel a letter denying coverage. The basis for this was that water below the surface of the ground exerting pressure on the dock's retaining

wall was a contributing cause of the dock's failure. The policy unambiguously excluded this type of loss. Lexington accordingly rejected the proof of loss and denied the claim.

Trial of this lawsuit proceeded in two phases. In phase one the jury determined what caused the Ferromet dock to fail. Based on the jury's findings the trial court ruled that the policy excluded the loss as a matter of law. No coverage existed under the "concurrent cause" exclusion for "water below the surface of the ground," which the jury found caused the dock's loss in part. Buckingham does not contest the court's ruling on coverage. In phase two the jury found, by its answers to special questions one, two, and four, that the defendants breached an express warranty and violated the DTPA and article 21.21. By its answers to special questions three and five, the jury found that Lexington knowingly violated the DTPA and engaged in an unconscionable action or course of action. By its answer to special question six, the jury found that the defendants knowingly violated article 21.21.

The jury awarded Buckingham $4,203,825 in actual damages. Buckingham settled its suit against Adams & Porter. The trial court granted Lexington's motion to disregard the jury's finding that it knowingly committed deceptive trade practices. The court gave Lexington a settlement credit of $2.5 million, and rendered judgment for $1,703,825, plus prejudgment interest of $318,255. Both Lexington and Buckingham appeal, but Ferromet is not a party to this appeal.

## I.  Limitations

Lexington's first issue is whether the statute of limitations barred Buckingham's claims under the DTPA and article 21.21. An action under both of these statutes must be brought within two years of the accrual of the cause of action.

Buckingham filed suit against Lexington on March 11, 1992, but did not serve it until January 1993. Lexington argues that it first denied coverage of Buckingham's claim in its letter of April 30, 1990, and, therefore, Buckingham's DTPA and Insurance Code claims accrued, as a matter of law, at that time. Lexington points out that its denial of coverage became final on September 15, 1990.

The jury found that Buckingham used diligence after filing this suit to obtain service of citation on Lexington. It also found that Buckingham, in the exercise of reasonable diligence, should have discovered all of Lexington's false, misleading, or deceptive acts or practices by May 4, 1992.

Lexington's April 30 letter advised Buckingham that "Lexington has made a preliminary determination that coverage is not provided for the damages claimed under the policy. The insured should not consider this preliminary determination that coverage is not provided as a final determination, and Lexington will review any additional evidence which the insured believes supports its claim."

By a second letter dated August 9, 1990, Lexington's counsel advised Buckingham's counsel that Lexington:

will again review this matter on September 10, 1990. If no further information has been received from you by that time, the determination that coverage is not provided for the damages claimed under the policy shall become final. If additional information is provided by September 10, 1990, such additional information will be taken into consideration in reaching a final determination on this claim. However, unless you are otherwise advised in writing by Lexington Insurance Company, its attorneys or adjusters, prior to September 15, 1990, the preliminary determination as stated in my April 30, 1990 letter is final.

By letter dated September 5, 1990, Adams & Porter advised Lexington that the proximate cause of the loss was earth movement, which the policy covered. They urged Lexington to further investigate the claim and reconsider its position. Howev-

er in its May 4, 1992, letter Lexington unequivocally and unconditionally rejected Buckingham's proof of loss.

A two-year limitations period governs causes of action under article 21.21 and the DTPA. TEX. INS.CODE ANN. art. 21.21, § 16(d) (Vernon Supp.1998); TEX. BUS. & COMM.CODE ANN. § 17.565 (Vernon 1987). The statute of limitations is an affirmative defense. TEX.R. CIV. P. 94. A defendant thus bears the initial burden to plead, prove, and secure findings to sustain the plea of limitations. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988).

### A. Due Diligence for Service

If Buckingham's claims accrued on April 30, 1990, it timely filed suit within the two-year limitations period on March 11, 1992. The issue is whether the evidence supported the jury's finding that Buckingham used due diligence in serving Lexington nearly nine months after limitations expired.

The mere filing of suit will not toll the running of limitations unless due diligence is exercised in the issuance and service of citation. *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 830 (Tex. 1990); *Rigo Mfg. Co. v. Thomas*, 458 S.W.2d 180, 182 (Tex.1970). When a plaintiff files a petition within the limitations period, but does not serve the defendant until after the statutory period has expired, the date of service relates back to the date of filing if the plaintiff exercised diligence in effecting service. *Gant v. DeLeon*, 786 S.W.2d 259, 260 (Tex.1990) (per curiam); *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 890 (Tex.1975) (per curiam).

In *Gant* the supreme court pointed out that Texas courts have consistently held that due diligence was lacking as a matter of law based on *unexplained* lapses of time between the date a claimant filed suit and the date of service. *See, e.g., Rigo*, 458 S.W.2d at 182 (17½ months between filing and service); *Liles v. Phillips*, 677 S.W.2d

802 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) (10 months between expiration of statute of limitations and service).

When a defendant affirmatively pleads the defense of limitations, and when failure to timely serve the defendant is shown, the plaintiff has the burden to explain the delay. *Liles*, 677 S.W.2d at 809. The duty to use diligence continues until the defendant is served. *De La Torre v. Our Lady of Guadalupe Ctr.*, 807 S.W.2d 889, 890 (Tex.App.—Corpus Christi 1991, no writ); *Martinez v. Becerra*, 797 S.W.2d 283, 284 (Tex.App.—Corpus Christi 1990, no writ); *Perry v. Kroger Stores, Store No. 119*, 741 S.W.2d 533, 535 (Tex.App.—Dallas 1987, no writ). The diligence required to meet this test is that which an ordinary prudent person would use under the same circumstances. *De La Torre*, 807 S.W.2d at 890; *Martinez*, 797 S.W.2d at 285. If no excuse is offered for a delay in procuring service of citation, or if lapse of time and the plaintiff's acts conclusively negate diligence, a lack of diligence will exist as a matter of law. *De La Torre*, 807 S.W.2d at 890; *Perry*, 741 S.W.2d at 534.

In the instant case Buckingham's counsel, Brad Irelan, gave Lexington's counsel, Robert Wellenberger, a settlement brochure which contained information to substantiate Buckingham's claim. During trial of this case Mr. Irelan gave two reasons why he did not serve Lexington immediately after filing suit in state court. First, his testimony showed that Mr. Wellenberger advised him not to proceed with service until Lexington had responded to the settlement offer. Second, on March 17, 1992, (six days after the plaintiffs filed suit) Ferromet's creditors placed it into involuntary bankruptcy. When Ferromet went into bankruptcy, Buckingham, as its wholly owned subsidiary, went into bankruptcy as well. Once Ferromet went into bankruptcy Mr. Irelan claimed that he no longer had the authority to proceed with the suit. He testified that If he had gone forward with service, and Lexington or Adams & Porter wanted to take the depo-

sition of either plaintiff, "I'd be out of luck because there was no one there on behalf of the companies any more." By this time Larry Whyte, who was the head of Buckingham and Ferromet, had resigned and was no longer at the helm of either company. Mr. Irelan believed he needed the bankruptcy court's permission to go forward with the suit. Mr. Irelan said he was having problems with the bankruptcy court and trustee. By letter dated December 17, 1992, Ferromet's bankruptcy trustee sent Mr. Irelan $61 to cover the cost of service. Mr. Irelan testified that from that date he vigorously moved on the case. When counsel asked him if there was any lack of diligence in serving the defendants he said that he did everything as diligently as he possibly could.

Mr. Wellenberger did not recall any agreement with Buckingham about not having to serve Lexington.

■ Section 108(a) of the bankruptcy code[1] tolls the running of limitations for two years from the time a party files bankruptcy. *See Andrews v. Diamond, Rash, Leslie & Smith,* 959 S.W.2d 646, 651 (Tex. App.—El Paso 1997, writ denied); *Southwestern Gas Pipeline, Inc. v. Scaling,* 870 S.W.2d 180, 186 (Tex.App.—Fort Worth 1994, writ denied).

Because Buckingham filed suit prior to expiration of limitations, Section 108(a) tolled the limitations period for two years from March 17, 1992, the date Ferromet filed bankruptcy. Thus Buckingham timely served Lexington in January 1993. *See Andrews,* 959 S.W.2d at 651; *Southwestern Gas,* 870 S.W.2d at 186.

### B. Accrual

■ A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that

authorize a party to seek a judicial remedy. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy Inc.,* 962 S.W.2d 507, 514 (Tex.1998). *Johnson & Higgins* involved an insured's negligence claim against the insurer based upon a denial of coverage for loss of profits. The court held that the insured "sustained injury when coverage was denied and, therefore, limitations commenced on that date because all facts required for a cause of action existed at that time." *Johnson & Higgins,* 962 S.W.2d at 514.

In its analysis the *Johnson & Higgins* court cited with approval *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96 (Tex.1994) and *Long v. State Farm Fire & Cas. Co.,* 828 S.W.2d 125 (Tex.App.—Houston [1st Dist.] 1992, writ denied). In *Celtic Life* the court held that a claim under article 21.21 accrued on the date the insurer "first denied coverage." *Celtic Life,* 885 S.W.2d at 100. In *Long* the court held that in the insurance context a cause of action under the DTPA accrues on the date that coverage is denied. *Long,* 828 S.W.2d at 128.

In *Murray,* the supreme court stated that when there is no outright denial of a claim the exact date of accrual of a cause of action becomes more difficult to ascertain and should be a question of fact to be determined on a case-by-case basis. *Murray,* 800 S.W.2d at 833 n. 2.

The jury found that Buckingham, in the exercise of reasonable diligence, should have discovered all of Lexington's false, misleading, or deceptive acts or practices by May 4, 1992. In analyzing the jury's findings we will use the well-established tests set forth in Robert W. Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 TEX. L. REV. 359 (1960).

---

1. (a) If applicable non-bankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of

   (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
   (2) two years after the order for relief.

   11 U.S.C.A. § 108(a) (West 1993).

■ We analyze the several letters denying coverage as follows:

(1) The April 30 letter did not constitute an outright denial of coverage under the policy; rather, the letter showed that Lexington had made only a preliminary determination that it would not cover the claim.

(2) The August 9 letter is not on its face an outright denial of coverage. It provided that unless Buckingham sent additional information by September 10, 1990, the initial denial of coverage would become final. It also provided that the preliminary determination announced in the April 30 letter would become final if Lexington, its attorneys, or adjusters, did not advise Buckingham in writing prior to September 15, 1990. Additional information concerning the claims was provided to Lexington prior to the deadline. Lexington did not show that Buckingham failed to meet the requirements stated in the August 9 letter. Thus, Lexington did not establish that Buckingham's cause of action accrued on either April 30, 1990, or September 15, 1990. *See Johnson & Higgins,* 962 S.W.2d at 514; *Murray,* 800 S.W.2d at 833 n. 2.

(3) The evidence showed that the injury-producing event occurred on May 4, 1992 when Lexington rejected the proof of loss. On that date facts came into existence that authorized Buckingham to seek a judicial remedy.

Accordingly the evidence supports the jury's finding that Buckingham should have discovered Lexington's deceptive acts or practices by May 4, 1992. Buckingham timely filed suit on March 11, 1992.

## C. Judicial Admission as to Accrual Date

■ Lexington argues that Buckingham and its parent, Ferromet, judicially admitted to the date that the claims accrued. The first judicial admission allegedly occurred when Ferromet's suit was pending in federal court. At that time Ferromet filed a reply to Lexington's response in opposition to plaintiff's motion to amend complaint and for remand to state court. In this pleading Ferromet asserted that "April 30, 1990[,] serves as the benchmark for the statute of limitations on its claims against Adams & Porter."

The supreme court has said that the facts alleged or admitted in the live pleadings of a party are binding on the pleader. *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex.1983). However, Buckingham was not a party to the federal suit. Ferromet's judicial admission is not binding on Buckingham.

The second judicial admission allegedly occurred when the plaintiffs' suit was pending in state district court. At that time the plaintiffs filed their first supplemental petition. In this pleading they stated that the causes of action stemming from Adams & Porter's conduct accrued when Lexington denied Buckingham's claim under the insurance policy on September 15, 1990. But, they also alleged that Buckingham had discovered "more or continuing unlawful conduct by Defendants after September 15, 1990. . . . "

After the jury reached its verdict in this case Buckingham filed a pre-judgment motion for leave to amend the first supplemental petition. It wanted to specify May 4, 1992 as the date it, in the exercise of reasonable diligence, should have discovered all of Lexington's false, misleading, or deceptive acts or practices. Lexington filed a response alleging that the amendment would severely prejudice it. The trial court granted Buckingham's motion.

■ Lexington argues that the trial court erred in allowing the amendment because the amendment changed the basis on which the case was tried. We disagree.

■ A party may amend its pleading after verdict but before judgment. *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 940 (Tex.1990). The *Greenhalgh* court held that the trial court prop-

erly allowed the plaintiff to amend the amount of damages claimed after the jury verdict was returned in the absence of surprise or prejudice to the defendant. The court stated that a trial court has no discretion to refuse an amendment unless: (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh*, 787 S.W.2d at 939.

■ In the instant case the amended pleading did not cause surprise or prejudice because the first supplemental petition asserted that Buckingham had discovered more unlawful conduct after September 15, 1990. This provided notice to Lexington that Buckingham might introduce additional evidence to show a later accrual date. The amendment is not prejudicial on its face because it does not assert a new cause of action or defense. Buckingham had pleaded the discovery rule and sought only to conform the pleadings to the verdict. We conclude the trial court did not abuse its discretion when it granted Buckingham leave to amend. *See Greenhalgh*, 787 S.W.2d at 939. Statements contained in superseded pleadings are not conclusive and indisputable judicial admissions. *Brooks v. Ctr. for Healthcare Servs.*, 981 S.W.2d 279, 283 (Tex.App.—San Antonio 1998, no writ). *See Sosa v. Central Power & Light Co.*, 909 S.W.2d 893, 895 (Tex.1995). We hold that the statutes of limitations did not bar Buckingham's claims. We overrule Lexington's first issue.

## II. Deceptive Practices

■ Lexington's second issue challenges the legal and factual sufficiency of the evidence to support the jury's answers to special questions one through four. The issue is whether Lexington or Adams & Porter engaged in any conduct which vio-

lated the DTPA or article 21.21 in relation to the policy issued to Buckingham.

Breimeister's testimony showed that prior to buying the insurance policy he dealt with John Hilliard, the insurance agent with Adams & Porter. He did not speak to anyone at Lexington or Southern Risk prior to buying the policy. Hilliard knew that Ferromet needed full or complete coverage for the docks. Breimeister testified that "Hilliard indicated that he would get us an all risks policy for everything, including the docks, that we needed to have insured." He stated that Adams & Porter said "that they would cover all risks, anything that could happen, everything that I needed they would take care of." Breimeister stated that "Everything he [Hilliard] did indicated, both verbal and otherwise, that I was going to have complete coverage for the dock." Prior to buying the policy Breimeister gave Adams & Porter a schedule which showed that Ferromet valued the docks at $4 million. Adams & Porter said that they would cover the schedule. Breimeister also testified that Hilliard "related that we will cover the dock as best we can." Based upon this statement Buckingham's counsel asked Breimeister:

Q. And did you understand from what he [Hilliard] said that that meant he would cover it, the entire dock?

A. Of course.

Q. If you had something that happened to that dock, insurance would pay for it.

A. Right.

Q. No doubt about that in your mind?

A. None whatsoever.

Q. Came from Mr. Hilliard.

He answered, "Yes." Breimeister believed that he was getting "full coverage" or "complete coverage" for the dock. Hilliard and Breimeister did not discuss any exclusions under the policy.

On cross-examination Lexington's counsel asked Breimeister as follows:

Q. [Y]ou are saying that he [Hilliard] misled you because in your mind you believed that anything that happened to your dock would be covered?

A. That's right.

Q. [D]idn't you understand ... that there were some exclusions in this policy?

A. I didn't read the policy specifically. There were exclusions. I suppose there are exclusions with every policy, but, again, I was not informed that these exclusions would specifically invalidate the insurance coverage to our dock.

Q. When you received ... [the policy] you knew it was a number of pages long and I believe you said just a minute ago that you know that any policy like this has some exclusions.

A. It would seem that way. Yes.

Q. [T]hat's no surprise to you at all, is it?

He answered, "No." However he claimed that he did not know that the policy would not cover the dock under some circumstances. He believed that "virtually everything" was covered. He assumed that he was getting an "all risks policy, whatever this means in insurance terms." He also testified that "There was no specific representation as to what I was or wasn't getting. I thought I was getting everything."

The evidence showed that no one at Ferromet or Buckingham received or read the policy prior to buying it. The policy's term began on December 31, 1988; however, Breimeister did not receive it until about February 20, 1989. Amendments to the policy arrived later. When buying the policy Buckingham only knew what Hilliard represented about the policy. Hilliard's testimony showed that he was to get the policy based upon the terms and conditions which Buckingham agreed to. Buckingham's counsel asked him, "And you know that what you are supposed to do is

to go through this thing [policy] with a fine toothed comb and where there are risks and dangers to coverages, to explain it to them...." He answered affirmatively. He testified that the term "all-risks" requires clarification. He knew that Buckingham relied upon him to provide the clarification. His background was marine insurance, and he thought of this policy in terms of a property insurance policy. When counsel stated to him that "all risks suggests that if something happens to me, I'm covered," he responded affirmatively. His testimony showed that part of his responsibility as a broker was to advise the client of likely gaps in coverage. He agreed that Ferromet and Buckingham relied on him to read the policy and advise them of coverage issues.

As a general rule an "all-risks" policy creates a special type of coverage. *Miles v. Royal Indem. Co.,* 589 S.W.2d 725, 729 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). This type of policy is one in which the insurer undertakes the risk for all losses of a fortuitous nature, which, in the absence of the insured's fraud or other intentional misconduct, is not expressly excluded in the agreement. *Muniz v. State Farm Lloyds,* 974 S.W.2d 229, 234 (Tex. App.—San Antonio 1998, no writ); *Brownsville Fabrics, Inc. v. Gulf Ins. Co.,* 550 S.W.2d 332, 336–37 (Tex.Civ.App.— Corpus Christi 1977, writ ref'd n.r.e.). One commentator described "all-risks" policies as follows:

> An "all-risk" policy creates coverage of a type not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision: the effect of such a policy is to broaden coverage and a fortuitous event is one which to the knowledge of the parties, is dependent upon chance.

Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 148:50, at 148–87 (3d ed.1998).

In *Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688 (Tex.1979), Bar

Consultants operated a bar. Bar's president, John Barber, bought an insurance policy from Tully Embrey, Royal Globe's agent. The one-year policy was renewed in 1974 and again in 1975. Each policy included a vandalism endorsement. Before the first policy was written Embrey assured Barber that he was "totally covered" from losses caused by vandalism. In 1974 Royal Globe paid a vandalism claim filed by Bar. In 1976 the bar again sustained vandalism, but Royal Globe refused to pay. Bar sued Royal Globe for violations of the DTPA and article 21.21. The supreme court held that:

> there is evidence that Bar Consultants was "adversely affected" and "injured" when it relied on the misrepresentations of coverage made by Embrey at the time of the initial policy in 1973 and impliedly made each time the policy was renewed. The injury to Bar Consultants was that it believed it was covered by a policy of insurance from any loss caused by vandalism when it was not so covered.... That belief was made even more logical and reasonable by the knowledge that, prior to renewing the policy, Royal Globe paid a claim for the same type damage to the bathroom area without questioning coverage, thus giving credence to the agent's previous misrepresentations.
>
> Accordingly, the representations made by agent Embrey at the time the policy was sold in September 1973 and impliedly made to Bar Consultants upon each renewal do furnish a basis for deceptive act or practice liability of Royal Globe....

*Royal Globe*, 577 S.W.2d at 694.

The agent's misrepresentation in *Royal Globe* that Bar Consultants was "totally covered" for losses due to vandalism is akin to Adams & Porter's misrepresentation in this case. Here the charge defined "Unfair or deceptive act or practice" as, in part, "Making any misrepresentation relating to insurance." Breimeister testified that Adams & Porter said "that they would

cover all risks, anything that could happen everything that I needed they would take care of." This statement as well as the rest of Breimeister's above-mentioned testimony showed that the policy Adams & Porter agreed to get for Buckingham would cover anything that happened to the docks. However the policy included exclusions and did not cover the Ferromet dock because it excluded damage to the dock contributed to by water below the surface of the ground. Hilliard read the policy, and, therefore, knew that it had exclusions. Breimeister's testimony showed that no one from Adams & Porter advised him that the policy had any specific exclusions or gaps in coverage. We conclude the jury's finding that Adams & Porter committed an unfair or deceptive act or practice when it represented that the "all-risks" policy would cover anything that happened to the docks was supported by the evidence.

### A. Agency

A corporation like Lexington can act only through its agents. *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 912 (Tex.App.—Austin 1991, no writ). Adams & Porter's misrepresentation of coverage does not, standing alone, become the misrepresentation of Lexington. Lexington's liability is dependent upon a specific agency relationship with Adams & Porter, or any misrepresentations Lexington may have made to Buckingham or Adams & Porter. First we examine Buckingham's claims that the evidence showed that Lexington made misrepresentations to it or to Adams & Porter.

Richard Owen was representing Ferromet in an acquisition by a British company. He wanted to confirm directly with the insurance company that all of Ferromet's assets, including the docks, were covered. Breimeister testified that "we asked Adams & Porter" to provide whatever Mr. Owen asked for to show that the property was properly insured. On April 25, 1989, Ed Smith, who had worked as a

branch manager at Southern Risk, signed a "Speed Letter" which stated "Our intent is to cover Docks, Piers, and Wharves as scheduled. We are preparing an endorsement to policy amending Paragraph A—Section III of Form CF0013 to remove." This letter was attached to a telecopy message on Adams & Porter's letterhead. Adams & Porter sent these items to Mr. Owen, and it sent copies to Whyte and Breimeister. During trial Buckingham's counsel asked Breimeister, "Do you feel like you were misled by Mr. Smith and Lexington with their speed memo when they say the docks were covered as scheduled?" He answered, "Yes." Smith's testimony showed that the original base policy excluded docks. This problem was overlooked during the policy's preparation, and he had to amend the policy to cover the docks. Smith's intent was to cover the docks as requested by Adams & Porter. The "Speed Letter" made no misrepresentations about the extent of coverage for the docks; it merely stated Southern Risk's intent to cover them as scheduled. Accordingly the "Speed Letter" could not have constituted a misrepresentation because it was true. *See Shandee Corp. v. Kemper Group*, 880 S.W.2d 409, 412 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

Buckingham argues that Lexington's delay in issuing the final policy to Breimeister and Whyte kept them from seeing its terms before buying it. The policy term began on December 31, 1988. Smith sent the policy to Hilliard for his review, and Hilliard sent it to Breimeister. Breimeister received it about February 20, 1989. Breimeister received at least two policy endorsements, one about March 23, 1989, and the other about May 2, 1989. When Breimeister received the policy he checked to see if the premium was the amount initially quoted, if the premium was paid, and if the policy included the proper deductibles and schedule of assets or replacement cost list. He did not read every single word of the policy, but he testified that "I took enough time to give myself comfort that we got what we thought we had." Whyte testified that he did not read the policy word for word. He looked at the policy's front page, and he checked to see if the policy covered the correct assets and values. Although Breimeister and Whyte did not receive the policy until after its term began the evidence showed they reviewed it and did not complain about any exclusions relating to coverage of the docks. The evidence does not indicate that Lexington delayed sending the policy to Hilliard in order to keep Breimeister and Whyte from reading the policy or discovering any misrepresentations about coverage. Smith's testimony showed that he covered the docks as requested by Adams & Porter.

Buckingham asserts that it paid $40,000 for a policy that provided no coverage for its dock, even though it communicated that specific need to Lexington. However the evidence showed that no one at Lexington or Southern Risk spoke to anyone at Ferromet or Buckingham prior to issuing the policy.

Buckingham asserts that according to expert testimony "coverage for the dock amounted to a sham." Buckingham's expert witness, Gary Beck, testified "that, if you read that [exclusion for underground water] in its absolute literal sense, that you could never have a covered loss in Harris County because of our gumbo soil. It's all got water in it." The evidence showed that Smith, manager for Southern Risk, provided the coverage requested by Adams & Porter. He provided coverage for ship collision, fire, and collapse of the dock. This was an "all-risks" policy, subject to exclusions. The evidence does not show that anyone at Adams & Porter requested Lexington or Southern Risk to provide coverage for water below the surface of the ground.

■ On December 29, 1988, Smith sent a quotation confirmation to Adams & Porter in which he quoted "[a]ll risk coverage including flood and quake." Buckingham

argues that Smith did not disclose that this coverage was subject to any terms, conditions, or exclusions in the policy. Although this assertion is correct the evidence showed that Smith provided the coverage requested by Adams & Porter. He never spoke to the insured in this case. Further, Adams & Porter represented itself as specializing in marine insurance. Couch states that "all-risks" policies, with or without exception clauses, are frequently used in connection with marine insurance. Lee R. Ross & Thomas F. Segalla, COUCH ON INSURANCE § 148:51 at 148–89 (3d ed.1998). We conclude that Smith's quotation confirmation was not a misrepresentation to Adams & Porter. To the extent that Southern Risk represented that it would provide a policy to insure against "all-risks" of loss or damage, no misrepresentation was made, as a matter of law. *See North Am. Shipbuilding, Inc. v. Southern Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 835 (Tex. App.—Houston [1st Dist.] 1996, no writ). In addition, undisputed evidence proved that Lexington did not represent to Adams & Porter or its agent, Hilliard, that the policy would cover the docks without exclusions.

### B. Actual or Apparent Authority

■ By its third issue Lexington asserts that there is no evidence to show that Adams & Porter had actual or apparent authority to act on its behalf. The charge did not include any special questions relating to agency. Instead, it provided instructions on agency, course and scope of authority, and actual and apparent authority. Relying on *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667 (Tex.1990), Buckingham argues that Lexington did not object to the lack of a special question on agency, and, therefore, waived any complaint.

In *Ramos* the court stated that when "issues are omitted which constitute only a part of a complete and independent ground and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in support of the judgment if no objection is made *and they are supported by some evidence.*" *Ramos*, 784 S.W.2d at 668 (emphasis added).

■ This point of error complains the evidence is legally insufficient to support the findings that Adams & Porter was the agent of Lexington. A complaint of no evidence may be preserved for appellate review by any of several means: motion for directed verdict; objection to the charge; motion to disregard the verdict; motion for new trial; and motion for judgment n.o.v. *Salinas v. Fort Worth Cab & Baggage Co.*, 725 S.W.2d 701, 704 (Tex. 1987). *See* Robert W. Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 TEX. L. REV. 359 (1960).

In its motion to disregard, Lexington complained that there was no evidence to show that Adams & Porter acted as its agent. We conclude that Lexington did not waive the complaint.

■ An insurer is generally liable for any misconduct by an agent that is within the actual or apparent scope of the agent's authority. *Celtic Life*, 885 S.W.2d at 98. In determining a principal's vicarious liability, the proper inquiry is whether the agent was acting within the scope of the agency relationship at the time of committing the act. *Celtic Life*, 885 S.W.2d at 99.

The Texas Insurance Code defines who is an agent. An insurer's agent is any person who: (1) solicits insurance on behalf of an insurance company; (2) transmits an application or policy to or from an insurance company; (3) receives or delivers a policy on behalf of an insurance company; (4) examines or inspects any risk; (5) receives, collects, or transmits an insurance premium; or (6) adjusts a loss on behalf of an insurance company. TEX. INS.CODE ANN. art. 21.02 (Vernon Supp. 1998); *Celtic Life*, 885 S.W.2d at 98 n. 3.

In the instant case Hilliard's testimony showed that he (1) examined the risks

involved with the property, and (2) Adams & Porter received the policy from Lexington and sent it to Buckingham, (3) collected the premium from Buckingham and sent it to Lexington, and (4) aided in adjusting the loss of the dock. Therefore Adams & Porter was Lexington's agent for purposes of article 21.02.

Our conclusion does not mean that Lexington is liable for Adams & Porter's misrepresentations of coverage. In *Royal Globe* the supreme court said:

> We are not to be understood as holding that the statutory authority granted an agent under Article 21.02 authorizes that agent to misrepresent policy coverage and bind the company to terms contrary to those of the written policy; that question was decided by us in *International Security Life Ins. Co. v. Finck, supra.* However, an insurance company that authorizes an agent to sell its policies may not escape liability for the misrepresentations made by that agent which violate Article 21.21 or Section 17.46 merely by establishing that the agent had no actual authority to make any such misrepresentation.

*Royal Globe,* 577 S.W.2d at 693.

The Texas Insurance Code divides insurance agents into local recording agents and solicitors. TEX. INS.CODE ANN. art. 21.14, § (1) (Vernon Supp.1998). While both types of agents may solicit insurance, a soliciting agent's authority is more limited than that of a local recording agent. *Royal Globe,* 577 S.W.2d at 693. Article 21.14, section (2)(a)(1) states, in relevant part, that a local recording agent is "a person or firm engaged in soliciting and writing insurance, being authorized by an insurance company or insurance carrier, including fidelity and surety companies, to solicit business and to write, sign, execute, and deliver policies of insurance, and to bind companies on insurance risks." TEX. INS.CODE ANN. art. 21.14, § 2(a)(1) (Vernon Supp.1998).

In *Shaller v. Commercial Standard Ins. Co.,* 158 Tex. 143, 309 S.W.2d 59 (1958), the court held that the statute's purpose is to vest "local recording agents with authority co-extensive with that of the company insofar as writing insurance is concerned and to remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute." *Shaller,* 309 S.W.2d at 63. A recording agent has the authority to speak and act for the company and transact all the insurance business of the company which it was authorized to transact under its state permit. *Home Ins. Co. v. Roberts,* 129 Tex. 178, 100 S.W.2d 91, 93 (1937, opinion adopted). When an insurer's recording agent misrepresents coverage the misrepresentation is considered that of the insurer. *Royal Globe,* 577 S.W.2d at 694.

In *Royal Globe* the court pointed out that Tully Embrey, the person who made the misrepresentations to the insured, was Royal Globe's local recording agent under article 21.14, section 2. The court said that he issued the policy from the "Tully Embrey Insurance Agency," signed the policy for Royal Globe as its agent, and Royal Globe did not deny his authority to do so. *Royal Globe,* 577 S.W.2d at 692. The court stated that Embrey, as Royal Globe's local recording agent, had statutory authority under articles 21.02 and 21.14(2) to sell insurance policies for the company and by necessary implication to represent the coverage afforded by the policies to the consumer. *Royal Globe,* 577 S.W.2d at 694.

Article 21.14, section (2)(a)(2) states, in relevant part, that a solicitor is "a person who is a bona fide solicitor and engaged in the business of soliciting and binding insurance risks on behalf of a local recording agent. . . ." TEX. INS.CODE ANN. art 21.14, § (2)(a)(2) (Vernon Supp.1998).

In *International Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544 (Tex.1973), the court stated that an insurer's soliciting agent has no power or authority to make a contract on behalf of the company or to

waive the terms of the policy. *Finck,* 496 S.W.2d at 546. A soliciting agent has no actual authority to bind the insurer. *Farmer Enters., Inc. v. Gulf States Ins. Co.,* 940 S.W.2d 103, 111 (Tex.App.—Dallas 1996, no writ) (citing *Royal Globe,* 577 S.W.2d at 692).

■■■■ During trial Buckingham's counsel asked its expert witness, Gary Beck, if Adams & Porter had authority to explain on Lexington's behalf the terms and conditions of the policy. He replied, "Yes, they did. I mean, as I testified earlier, Adams & Porter is really the only one that can, under the Insurance Code, deal with the public, so the public in this case being Buckingham." Beck stated that he based his answer on the "course of dealing and how the agent/company relationships work in Texas, and everywhere for that matter in the insurance business."

The record includes a telecopy message from Hilliard to Breimeister. The message stated, in relevant part, "Scott, we confirm binding your property insurance at annual premium of $40,000 effective December 31, 1988 12:01 AM for one year thru American International Group[2]...." The record includes a copy of the binder. The binder is on Adams & Porter letterhead.

During trial Buckingham's counsel asked Beck to explain how the insurance binder was an indication of authority for Adams & Porter to speak for Lexington. Beck explained that the binder was evidence of the creation of insurance coverage and that it binds the company to the risk. He also said that "Adams & Porter, even though they may have testified that they didn't have authority to issue binders and policies and so forth, they probably, none the less, did."

Other evidence showed that Adams & Porter submitted Buckingham's insurance risk to the market and requested quotes

on Buckingham's insurance coverage from at least three companies, including Southern Risk. Southern Risk responded by sending Adams & Porter a quotation confirmation relating to the subject policy. The bottom of this document included this language: "COVERAGE MAY NOT BE BOUND WITHOUT PRIOR CONSENT FROM THE ABOVE NAMED COMPANY(IES) AS CONFIRMED BY SOUTHERN RISKS [sic] SPECIALISTS, INC. ...." Hilliard sent Southern Risk a telecopy message which stated, in relevant part, "We confirm *your binding* 100% Lexington property insurance at annual premium of $40,000 effective December 31, 1988 12:01 AM...." (Emphasis added).

Ed Smith, who had worked as Southern Risk's branch manager, testified that Southern Risk was Lexington's underwriting arm; it received risks submitted by brokers and decided whether to insure the risks. Lexington was a surplus lines carrier doing business through brokers that represented insureds. Adams & Porter had to deal with Lexington through Southern Risk. Smith had the authority to bind coverage and evaluate and set premiums. Adams & Porter could only deliver a policy after Southern Risk issued and countersigned it. Adams & Porter had no authority to issue a policy. Smith never talked to the insured but dealt with Hilliard regarding the policy. He relied on Adams & Porter for the necessary information to assess the risks. Adams & Porter did not represent Southern Risk in any respect, and Southern Risk did not represent Adams & Porter.

Beck's testimony that Adams & Porter had authority to explain on Lexington's behalf the terms and conditions of the policy was not conclusive on that issue. He was not speaking about any first-hand knowledge he had about the legal relationship, if any, between Adams & Porter and Lexington. The fact that only Adams &

---

2. Southern Risk and Lexington were American International Group's wholly owned subsidiaries.

Porter could deal with the public does not make them Lexington's recording agent with authority to bind it on insurance risks. Even though the insurance binder appeared on Adams & Porter letterhead, the great weight of the evidence is that only Ed Smith could bind coverage and that he did so in this case. The evidence does not show that: (1) Lexington had authorized Adams & Porter to solicit business and to write, sign, and execute insurance policies; (2) Adams & Porter had authority co-extensive with Lexington insofar as writing insurance; or (3) that Adams & Porter had the authority to speak and act for Lexington and transact all the insurance business of Lexington which it was authorized to transact under its State permit. We conclude that Adams & Porter was not Lexington's recording or soliciting agent. The evidence showed that it was an insurer's agent under article 21.02 and did not have actual authority to represent coverage on Lexington's behalf.

### C. Apparent Authority

■ Absent actual authority the insurance agent can bind the insurer only if the agent had apparent authority to act for the carrier. *Guthrie v. Republic Nat'l Life Ins. Co.*, 682 S.W.2d 634, 637 (Tex.App.— Houston [1st Dist.] 1984, writ ref'd n.r.e.). The supreme court has stated that "[a]pparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority." *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex.1998). In *NationsBank v. Dilling*, 922 S.W.2d 950, 952–53 (Tex.1996) (per curiam) the court stated:

> To establish apparent authority one must show that a principal either knowingly permitted an agent to hold itself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority. A court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether an agent has apparent authority.

* * * * *

> One seeking to charge a principal through the apparent authority of its agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that it purports to exercise. The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner.

*NationsBank*, 922 S.W.2d at 952–53 (citations omitted).

■ The evidence does not show that when Adams & Porter made the misrepresentations Lexington knowingly allowed Adams & Porter to hold itself out as having authority to act as its recording or soliciting agent, or that Lexington showed a lack of ordinary care such that it clothed Adams & Porter with indicia of authority to act as its recording or soliciting agent. We conclude that Adams & Porter, as Lexington's agent under article 21.02, did not have apparent authority to act on Lexington's behalf. We hold that Lexington was not responsible for any misrepresentation made by Adams & Porter. We sustain the third issue.

In its cross appeal Buckingham complains that the trial court erred: (1) by disregarding the jury's finding that Lexington knowingly committed deceptive trade practices: (2) in computing prejudgment interest; and (3) improperly offset its actual damages with a settlement credit. Due to our disposition of the above issues we need not address Buckingham's cross appeal or Lexington's remaining issues.

We REVERSE the judgment and RENDER that Buckingham Gate, Ltd., Inc.,

take nothing by its suit against Lexington Insurance Company.