

# NUMBER 13-13-00475-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**ADOLFO VELA D/B/A
ADELCO ENTERPRISES,**                                                    **Appellant,**

**v.**

**CATLIN SPECIALTY
INSURANCE COMPANY, ET AL.,**                                            **Appellees.**

---

### On appeal from the 445th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Perkes
### Memorandum Opinion by Justice Benavides

This is an appeal from a summary judgment in a dispute related to a commercial

general liability insurance policy issued to appellant Adolfo Vela d/b/a Adelco Enterprises

("Vela").   By six issues, which we re-number as three, Vela asserts that the trial court

erred by: (1) granting appellee Jose Campos d/b/a Joe Campos Insurance's ("Campos") motion for summary judgment; (2) granting appellee and cross-appellant Catlin Specialty Insurance Company's ("Catlin") motion for partial summary judgment as to Vela and Williams Development & Construction, Inc. ("Williams"); and (3) denying Vela's first, second, and third motions for partial summary judgment. By two cross-issues, Catlin asserts that the trial court: (1) abused its discretion in denying Catlin's request for attorneys' fees; and (2) erred by refusing to award costs to Catlin. We affirm in part and reverse and remand in part.

## I.   BACKGROUND

### A.   The Parties and the Policy

Vela was a construction contractor based in the Rio Grande Valley. On November 29, 2006, Vela applied for a commercial general liability insurance policy ("the policy") through Campos's insurance agency in Pharr, Texas. Campos submitted the application to Leicht General Agency ("LGA"), a managing general agent for Catlin.[1]  On January 8, 2007, LGA, on behalf of Catlin, issued an insurance binder for the policy to Vela for the term of January 8, 2007 to January 8, 2008. Additionally, Vela entered into a financing agreement for his premiums on the policy through Campos with Premium Finance Corporation, Incorporated.

The policy stated that it covers "bodily injury" and "property damage" only if:

(1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

---

[1] At the time of Vela's insurance application, Catlin Specialty Insurance Company was known as Wellington Specialty Insurance Company.

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed [ . . . ] knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

An "occurrence" was defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" was defined as: "physical injury to tangible property, including all resulting loss of use of that property."

The policy also recited several exclusions to coverage including a "Damage to Property" exclusion and an endorsement to the policy for subsidence of land. The subsidence of land exclusion stated the following:

This policy does not apply to "bodily injury," "personal injury," or "property damage" arising out of or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, whether arising from natural causes or resulting from operations of the Named Insured or any other subcontractor of the Named Insured.

Furthermore, the policy contained another exclusion related to damage to property which applied to: "That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it." The policy defined "your work" as "work or operations performed by [Vela] or on [Vela's] behalf; and . . . material, parts or equipment furnished in connection with such work or operations."

**B.    The Kohl's Project Litigation**

On June 12, 2007, Vela contracted with Williams to work as a subcontractor for the construction of a Kohl's Department Store in Brownsville, Texas ("the Kohl's project"). Vela's scope of work related to the building of a concrete retaining wall.[2]

On December 13, 2007, Vela filed suit against Williams and others for breach of contract related to unpaid money for his work on the Kohl's project. Williams answered the lawsuit and filed a counterclaim against Vela for breach of contract and negligence. Williams alleged that Vela's work on the Kohl's project was "found to be defective; namely, the wall is falling down, the parking lot is sinking and the surface is cracking. To say it simply, [Vela's work] is junk and will need to be demolished and rebuilt." Williams further alleged that Vela's work was "shoddy" and asserted that damages for the repairs would exceed $100,000.00.

On February 11, 2008, Williams's counsel sent a notice of claim letter to Vela and Catlin related to its claims against Vela for his "defective" work on the project. In the letter, Williams asserted that the defective condition of the project "has been exhibited by severe subsidence that is causing the curb and the parking surface in the parking lot to fail." Vela's counsel subsequently notified Campos in writing about Williams's counterclaim against Vela and asked Campos to "promptly forward a copy of such counter-claim to [Vela's] appropriate insurers."

On March 11, 2008, a senior claims examiner for Catlin wrote to Vela's counsel and disclaimed any insurance coverage related to Williams's pending counterclaim. Catlin justified its denial by asserting that the alleged defect was discovered in February

---

[2] On June 27, 2007, Williams was added as an additional insured on the policy.

4

2008, which was outside of the policy's coverage date, and because Williams alleged that the damage "occurred to the property by way of subsidence," such allegation is not covered in the policy. However, on August 28, 2009, counsel for Catlin notified Vela's counsel in writing that a fact issue existed as to the date of the occurrence of Williams's allegations, and that Catlin changed its mind and agreed to defend Vela under a reservation of rights pursuant to the policy's terms and conditions. On September 2, 2009, Vela notified Catlin in writing that he declined Catlin's offer of a defense and moved forward with the litigation with his previous counsel.

Williams later filed a second amended answer and first amended counterclaim against Vela again for breach of contract and negligence. Specifically, Williams alleged that: (1) Vela "failed to complete the work required"; (2) Vela's work was "defective and not performed in a good and workmanlike manner, namely the wall is falling down, the parking lot is sinking and the surface is cracking"; (3) Vela failed to "install the rock that was called for by the specifications and or failed to install appropriate drainage in the retaining wall"; (4) Vela's "foreman was instructed to build the wall per plans yet he did not leave a 'leg' on the footing and formed the footing into an 'L' shape rather than a 'T' shape as designed"; (5) "The rebar installed along the fence line was not per [Williams's] instructions in the plans"; (6) Vela "failed to meet a single [required] deadline on the project"; (7) Vela "failed to finish the work and refused to come back despite agreeing to return"; (8) Vela "failed to provide adequate equipment to perform the work required pursuant to the contract, over excavated and hauled approximately 150–200 truckloads (at 16 yards [illegible] per truckload) from the jobsite without instruction and/or authority to do so"; and (9) Vela breached a duty by "failing to comply with the standard of care as

5

exhibited by, among other things, subsidence that caused the curb and the surface of the parking lot to fail."

Subsequently, Vela and Williams entered into an agreement related to the Kohl's project litigation, which included the following relevant terms: (1) Vela will non-suit, without prejudice, his claims against Williams; (2) Vela and Williams agree to waive their respective right to a jury trial for any litigation related to this case; (3) In any future lawsuit against Catlin and/or Campos to which Vela and/or Williams are parties, "all sums recovered by [Vela] and all sums recovered by [Williams] (hereinafter collectively the "Recovered Sum") shall be divided . . . as follows: (1) [. . . ] $122,860 [ . . . ] to Vela; (2) $125,000 [ . . . ] to Williams; and (3) all of the remaining Recovered Sum . . . to Vela"; and (4) If Vela "in the aggregate recovers in excess of $200,000.00 from any source, including the Recovered Sum, . . . [Williams] shall be fully released."

On July 19, 2010, a bench trial commenced solely as to Williams's causes of action for breach of contract and negligence against Vela. Williams called three witnesses to testify at trial.[3] Williams's project manager, Jeff Oleyar, outlined the various defects in Vela's work, including issues with the footing of the retaining wall, over-excavation of "fill dirt," and not having "enough manpower" and "material" to finish the project. Oleyar testified that Vela did not complete the project, and that Williams hired another construction company to complete the work. On cross-examination, Oleyar testified that the retaining wall collapsed into the earth as a result of "failure of the subgrade beneath"

---

[3] Prior to any testimony, Williams offered, without objection, sixty exhibits related to the project, including contracts, photos, and illustrations.

6

the pavement of the parking lot. On re-direct Oleyar affirmed that "the only reason that [the] parking lot and . . . curbs collapsed and had to be replaced was because the wall moved." Oleyar testified that the collapse was not a consequence of "subsid[e]nce [or] sinkholes," but instead was the result of a wall that was built not according to the design plans and specifications.

Shyam Veeramachineni, an engineer hired by Kohl's regarding the project, testified by deposition that he examined and tested the parking lot "with relation to the asphalt [and] movement of the pavement." According to Veeramachineni, certain areas of the parking lot did not meet the "airward content or the percent compaction requirements" and recommended that those parts "be removed and replaced." Williams also called its company representative, Jimmie Jones. Jones testified that he observed "some cracking" on the outside surface of the retaining wall as well as on the asphalt. Vela's counsel did not cross-examine Veeramachineni or Jones. Finally, Williams's counsel testified that his reasonable and necessary attorney's fees in the case through trial and appeal totaled $122,500. Williams's counsel presented closing arguments, while Vela's counsel did not. Instead, Vela's counsel advised the trial court that the "most effective way" for him to "communicate [his] specific contentions would be in the forms of objections to any of the proffered proposed findings of fact or conclusions of law."

On October 11, 2010, the trial court rendered final judgment awarding Williams: (1) $162,204 for costs to repair the retaining wall; (2) $50,000 for the "cost to restore fill dirt;" (3) $100,000 for damage to Williams's reputation; and (4) attorney's fees totaling $122,500, plus pre- and post-judgment interest.

7

## C.     Underlying Lawsuit

Following the Kohl's project litigation, Vela filed suit against Catlin and Campos.[4] In his live petition, Vela alleged that at all relevant times, Campos acted as Catlin's actual and apparent agent and asserted, inter alia, that: (1) Campos fraudulently, negligently, and gross negligently failed to disclose "material facts" to Vela about the policy or certificates of insurance; (2) Campos forged Vela's signature to certain premium financing documents; (3) Catlin negligently and gross negligently failed to defend Vela against claims brought against him by Williams; (4) Catlin failed to indemnify Vela with regard to the unpaid judgment in Williams's favor against Vela; and (5) Catlin breached a common law duty owed to Vela to exercise "care[,] skill, reasonable expedience and faithfulness" in handling his insurance coverage.   Vela sought damages for: (1) expenses he incurred while defending himself against Williams in the Kohl's project litigation, (2) the amount of his unpaid judgment debt owed to Williams, (3) mental anguish damages, and (4) attorney's fees.

Vela, Catlin, and Campos each filed competing motions for summary judgment with regard to Vela's claims against Catlin and Campos.   Additionally, Catlin filed a claim for attorney's fees against Vela and Williams, who intervened in the underlying lawsuit between Vela, Catlin, and Campos, for bringing "groundless claims" that were "jointly pursued [by Vela and Williams] in blatant bad faith."   The trial court granted Catlin's and Campos's motions for summary judgment as to Vela's and Williams's claims, denied

---

[4] Vela initially filed the underlying suit in County Court at Law No. 3 of Cameron County, but the case was later transferred to the 445th District Court ("the trial court") due to a lack of subject-matter jurisdiction by the county court.

8

Vela's motions for summary judgment seeking affirmative relief, and rendered a take-nothing judgment as to Vela's and Williams's claims. The trial court further denied Catlin's request for attorney's fees and allocated costs to each party. This appeal and cross-appeal followed.[5]

## II. VELA'S APPEAL

By three related issues, Vela asserts that the trial court erred by (1) granting Campos's motion for summary judgment; (2) granting Catlin's motion for partial summary judgment as to Vela and Williams; and (3) denying Vela's first, second, and third motions for partial summary judgment. We will address these issues together. *See* TEX. R. APP. P. 47.4.

### A. Standard of Review

We review a trial court's grant of summary judgment de novo. *Knapp Med. Ctr., Inc. v. Grass*, 443 S.W.3d 182, 187 (Tex. App.—Corpus Christi 2013, pet. denied). When all parties move for summary judgment and the trial court grants one and denies the others, we determine all questions presented and render the judgment that the trial court should have rendered. *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007). When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious. *See FM Props Op. Co. v. City of Austin*, 22 S.W.3d 868, 873–74 (Tex. 2000).

---

[5] Williams did not file a notice of appeal.

**B.      Discussion**

**1. Catlin's Duty to Defend**

Catlin argues persuasively that the threshold issue in this case is whether the policy covers the claims asserted by Williams against Vela in the Kohl's project lawsuit. Because we agree that our determination of this issue controls the resolution of a substantial portion of the case, we will address it first.

We analyze disputes over the interpretation of insurance contracts under the well-established principles of contract construction, attempting to determine the parties' intent through the written language of the policy.   *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 154 (Tex. 2010); *see State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010) (outlining principles of contract construction).   Whether an insurance carrier owes a duty to defend under an insurance policy is a question of law that we review de novo.   *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied).   The duty to defend is distinct and broader than the duty to indemnify.   *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008).   Once coverage has been found for any portion of a suit, an insurer must defend the entire suit.   *St. Paul*, 999 S.W.2d at 884 (internal citations omitted).   An insurer's duty to defend is determined by the allegations in the pleadings and the language of the insurance policy.   *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997).   Thus, if a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured.   *Id.*   This is known as the "eight corners" rule.   Under the eight corners rule, the Texas Supreme Court has stated that we give the allegations in the petition a liberal

10

interpretation and

> [w]here the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*Id.* (quoting *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965)). In conducting our review, we must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged. *Id.*

Vela's pleadings against Catlin and Campos states that Williams filed claims against him alleging that he "wrongfully caused various damages" related to the Kohl's retaining wall project. In its claims against Vela, Williams alleged that Vela's "work was found to be defective; namely, the [retaining] wall is falling down, the parking lot is sinking and the surface is cracking." Furthermore, in Williams's notice of claim letter to Vela's counsel attached to its counterclaim, Williams's counsel again attributed its damages to Vela's work and failure to "abide by the plans and specifications" for the project. Williams sought the costs for the repairs to fix the damaged wall and parking lot.

Catlin argues that under the eight corners rule, Williams's allegations preclude coverage under the policy's "your work" exclusion. We agree. The policy expressly excludes "property damage" to "part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." The policy further defines "your work" as "work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." The Texas Supreme Court has defined this exclusion as a "business risk exclusion," which precludes

11

coverage for economic loss claims based on product defects.   *See Nokia*, 268 S.W.3d at 500.

> Coverage under a commercial general liability insurance policy is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or work is not that for which the damaged person bargained.   Pursuant to this understanding, certain exclusions have been included within the standard commercial general liability policy for the express purpose of excluding coverage for risks relating to the repair or replacement of the insured's faulty work or products, or defects in the insured's work or product itself. These "business risk" exclusions, as they are commonly called, are intended to provide coverage for tort liability, not for the contractual liability of the insured for loss which takes place due to the fact that the product or completed work was not that for which the other party had bargained.

*Id.* (quoting 9A COUCH ON INSURANCE § 129:16 (3d ed. 2014)).   Williams's allegations clearly state that Vela's work was the cause of the retaining wall's failure and defective condition.   Thus, we conclude that Catlin established as a matter of law that the "your work" exclusion excluded coverage for Williams's claims against Vela for damages related to the retaining wall.[6]

Vela's brief acknowledges the "your work" exclusion in the policy, but argues that Vela did not perform work on the parking lot surface or parking lot curb, and, therefore, coverage should not be excluded under that exclusion.   Catlin agrees that the "your work" exclusion does not apply to the parking lot surface or parking lot curb damages, but instead argues that the subsidence exclusion precludes coverage for the curb and parking lot damage.

---

[6] Catlin concedes in its brief that the contractual-liability-exclusion argument made to the trial court is inapplicable to this case and abandons this argument on appeal.   Accordingly, we will not address that point in this opinion.

The policy's subsidence-of-land exclusion excludes coverage for "property damage arising out of or aggravated by the subsidence of land as a result of landslide, mudflow, earth sinking or shifting, whether arising from natural causes or resulting from operations of [Vela] or any other subcontractor of [Vela]." Williams's claims against Vela alleged that subsidence caused the curb and parking lot to fail as a result of the defective work of the retaining wall. We are perplexed by Vela's interpretation of the subsidence exclusion. Vela first argues that the exclusion should be read to say that the subsidence must be caused by either natural causes, or operations of Vela, or operations of a subcontractor to Vela, but not together in combination. Furthermore, Vela asserts that in construing the language of the subsidence exclusion, "one would conclude that the drafters intended the listed alternative causes to be 'all or none' causes." We are unpersuaded by Vela's arguments and agree with Catlin.

Our primary goal in contract interpretation is to determine the contracting parties' intent through the policy's written language by confining our review to the four corners of the policy. *See Page*, 315 S.W.3d at 527. Additionally, the fact that the parties may disagree about the policy's meaning does not create an ambiguity. *Id.* Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law. *Id.* We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative. *Id.* The policy's subsidence exclusion excludes coverage for any property damage related to the subsidence, whether the cause of the subsidence is by natural causes, Vela's operations, or Vela's subcontractor's operations. In other words, if any or all of those three factors cause subsidence, coverage is excluded. Therefore, under

13

the eight corners rule, we conclude that this exclusion applies to the damages to the parking lot surface and curb damage because Williams alleged that the damages were the result of subsidence caused by Vela's work on the project.

In summary, because the policy excluded coverage under the "your work" and subsidence exclusions, we hold that Catlin established as a matter of law that it did not have a duty to defend Vela in the Kohl's project litigation, and Vela did not produce evidence raising a fact issue. *See* TEX. R. CIV. P. 166a(c).

### 2. Catlin's Duty to Indemnify

Next, we examine whether Catlin had a duty to indemnify Vela for the unpaid judgment against him in Williams's favor. Catlin first argues that because it had no duty to defend, it likewise had no duty to indemnify.

The Texas Supreme Court has clarified an insurer's duty to defend in relation to its duty to indemnify. "In liability insurance policies generally, an insurer assumes both the duty to indemnify the insured, that is, to pay all covered claims and judgments against an insured, and the duty to defend any lawsuit brought against the insured that alleges and seeks damages for an event potentially covered by the policy, even if groundless, false or fraudulent," subject to the terms of the policy. *D.R. Horton-Tex., Ltd. V. Markel Int'l Ins. Co., Ltd.*, 300 S.W.3d 740, 744 (Tex. 2009) (quoting 14 COUCH ON INSURANCE § 200:3 (3d ed. 2014)). "The duty to defend and the duty to indemnify are 'distinct and separate duties.'" *Id.* (quoting *Utica Nat'l Ins. Co. v. Am. Indem. Co.,* 141 S.W.3d 198, 203 (Tex. 2004)). Simply put, both duties are independent and the existence of one does not necessarily depend on the existence or proof of the other. *Id.* at 745. The insurer's duty to indemnify depends on the facts proven and whether the damages caused

14

by the actions or omissions proven are covered by the terms of the policy. *Id.* at 744; *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 656 (Tex. 2009); *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006) ("[T]he facts actually established in the underlying suit control the duty to indemnify.").

Thus, Catlin's duty to indemnify turns upon whether the damages caused by Vela's actions or omissions are covered by the terms of the policy. Williams's damages from the Kohl's litigation relate to: (1) the cost of repairing the retaining wall; (2) the "cost to restore fill dirt"; and (3) damage to Williams's reputation. As we discussed previously, the "your work" and "subsidence" exclusions precluded coverage for damages related to Vela's work on the retaining wall and any consequent damages that work may have caused to the parking lot surface or curb. Furthermore, the policy only covers "sums that [Vela] becomes legally obligated to pay" as damages because of "bodily injury," "property damages," or "personal and advertising injury."[7] As a result, Williams's reputation damages do not fall under any of the covered damages listed in the policy.

Moreover, with these principles in mind, we also examine Catlin's second argument that because the Kohl's project litigation was a "sham" proceeding, it likewise created no duty for Catlin to indemnify Vela. In support of its argument, Catlin cites two cases.

---

[7] "According to the policy's definition, "personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses: (a) false arrest, detention, or imprisonment; (b) malicious prosecution; (c) wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; (d) oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's good; (e) oral or written publication, in any manner, of material that violates a person's right of privacy; (f) the use of another's advertising idea in your "advertisement"; or (g) infringing upon another's copyright, trade dress or slogan in your advertisement.

15

The first is *State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). In *Gandy*, the defendant Pearce was sued by his stepdaughter (Gandy) for sexually abusing her as a child. *Id.* at 697. State Farm, which at one time issued Pearce a homeowner's policy, agreed to pay for Pearce's attorney to defend the lawsuit, but reserved the right to deny coverage. *Id.* Without notice to State Farm, Pearce settled the lawsuit with Gandy by agreeing to a judgment in her favor of more than $6 million and assigning to Gandy any claims he had against State Farm. *Id.* Gandy then sued State Farm as Pearce's assignee to collect the agreed judgment under Pearce's policy and to recover for State's Farm's alleged failure to properly defend Pearce. *Id.* The jury found State Farm was negligent and that it violated the DTPA. *Id.* The jury awarded Gandy $200,000 in actual damages plus pre-judgment interest, a $2,000 statutory penalty, fifteen percent of the total as attorney fees, post-judgment interest, and costs. *Id.* at 704. The intermediate court of appeals affirmed, and State Farm appealed to the Texas Supreme Court arguing mainly that Pearce's assignment to Gandy should not be given any effect. *Id.* at 705.

On appeal, the Texas Supreme Court agreed with State Farm and rendered a take-nothing judgment against Gandy. *Id.* at 720. It further held that "[i]n no event is a judgment for plaintiff against defendant, rendered without a fully adversarial trial, binding on defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee." *Id.* at 714. The *Gandy* Court explained that such prior settlement arrangements are problematic when plaintiff's claims are arguably covered by insurance, because once the agreement is made, the insured defendant "no longer has an incentive to oppose [the plaintiff]" in the underlying suit. *Id.*

16

The court likened these insurance settlement agreements to Mary Carter Agreements,[8] which have been declared void as against public policy due to their promotion, rather than discouragement of, further litigation. *Id.* at 709–10. As a result, the Texas Supreme Court similarly concluded that the settlement arrangement in *Gandy* was invalid because it did not "resolve the parties' disputes but prolonged and confused them." *Id.* at 714.

Catlin also cites *First General Realty Corp. v. Maryland Casualty Co.*, 981 S.W.2d 495 (Tex. App.—Austin 1998, pet. denied). In *First General*, a group of subdivision homeowners sued several developers for damages to their homes related to a series of floods. *Id.* at 496. Fireman's Fund Insurance Company ("Fireman's") insured the developers, while Maryland Casualty Company ("Maryland") provided primary and excess coverage for the developers for some of the claims. *Id.* Fireman's assumed the developers' primary defense. *Id.* Maryland participated in some "joint defense meetings and settlement discussions with the [developers] and [homeowners]," but ultimately did not provide the developers with a defense against the homeowners and made no payment toward settlement of the homeowners' claims. *Id.* at 497. The homeowners and developers eventually entered into an agreement that released the developers from liability except for a certain period of time, and the developers assigned the homeowners all of their claims and causes of action against their insurers, specifically Maryland. *Id.* A district court later rendered judgment in the homeowners' favor for

---

[8] A Mary Carter agreement is any settlement arrangement between the plaintiff and some of the defendants in a case by which the settling defendants agree to pay the plaintiff a certain amount of money and to participate in the trial against the nonsettling defendants, and the plaintiff agrees to release the settling defendants from liability and, if the judgment against a nonsettling defendant is large enough, to repay the settlement amount. *See Gandy*, 925 S.W.2d 696, 709 (Tex. 1996) (citing *Elbaor v. Smith*, 845 S.W.2d 240, 247 (Tex. 1992)).

17

approximately $9 million as actual damages.  *Id.*

The developers brought a declaratory-judgment action against Maryland requesting a determination that coverage under Maryland's policies existed and that Maryland was obligated to provide a defense in the underlying lawsuit.  *Id.*  The homeowners intervened.  *Id.*  The trial court held, *inter alia*, that:  (1) Maryland did not meet the test set out in *Gandy* to invalidate the assignment between the developers and the homeowners; and (2) the judgment and findings in the underlying suit were not binding.  *Id.*  Relying on *Gandy*, the Austin Court of Appeals held that "an agreed judgment between a plaintiff and a defendant is not binding on the insurer because an insurer's liability to a plaintiff who is the insured's assignee should be determined by 'the strength of plaintiff's claims rather than the generosity of defendant's concessions.'"  *Id.* at 499 (quoting *Gandy*, 925 S.W.2d at 719).  As a result, the *First General* court held that the underlying judgment agreed to between the homeowners and the developers was not binding on Maryland.  *Id.* at 500.

We find *Gandy* and *First General* highly instructive.  Prior to the trial in the Kohl's project lawsuit, Williams and Vela entered into an agreement in which the parties agreed, among other things, that as to any future lawsuit against Catlin and/or Campos to which Vela and/or Williams are parties, "all sums recovered by [Vela] and all sums recovered by [Williams] (hereinafter collectively the "Recovered Sum") shall be divided . . . as follows: (1) [. . . ] $122,860 [ . . . ] to Vela; (2) $125,000 [ . . . ] to Williams; and (3) all of the remaining Recovered Sum . . . to Vela."  After a bench trial, Williams was awarded: (1) $162,204.00 for costs to repair the retaining wall; (2) $50,000.00 for the "cost to restore fill dirt"; (3) $100,000.00 for damage to Williams's reputation; and (4) attorney's fees

18

totaling $122,500, plus pre- and post-judgment interest. Catlin argues that the pre-trial agreement and minimal participation by Vela during the bench trial present a "sham of adversity." We agree.

To determine whether an underlying judgment was the result of a fully adversarial trial, we must review the extent to which the parties to the underlying proceeding participated. *See Yorkshire Ins. Co. v. Seger*, 279 S.W.3d 755, 772 n.25 (Tex. App.—Amarillo 2007, pet. denied) (citing *Gandy*, 925 S.W.2d at 713). First, we note that the record in this case reveals that Vela appeared at trial by and through his counsel, but he did not appear personally. When asked during his deposition on May 11, 2012, whether he understood that a judgment was entered against him, Vela responded by stating, "I don't believe so, no." Furthermore, Vela stated that he had no knowledge of the bench trial in 2010 and believed that he was still pursuing Williams for money owed to him from the Kohl's project.

Vela also testified that he has not paid any money to Williams related to any judgment against him. We also note that during the Kohl's project bench trial, Vela's counsel did not make an opening or closing statement and did not offer any evidence into the record to challenge any of Williams's claims.[9] Vela's counsel did, however, cross-examine Williams's only live witness.

Vela makes three counter arguments against Catlin's "sham" allegations. First, Vela asserts that when an insurer refuses to provide a defense to its insured, and an

---

[9] Vela's counsel advised the trial court at the conclusion of the Kohl's project bench trial that in the interest of saving the trial court's time, he would lodge his "specific contentions . . . in the forms of objections to any of the proffered findings of fact or conclusions of law." However, Vela's objections, if any, were not included in the record.

agreed judgment is entered against the insured, the insurer is barred from collaterally attacking the agreed judgment unless the trial court lacked jurisdiction. We are unpersuaded by this argument because it relies on one case, *Employers Casualty Co. v. Block*, 744 S.W.2d 940, 943 (Tex. 1988), which was partially disapproved by the Texas Supreme Court in *Gandy*. *See Gandy*, 925 S.W.2d at 714. More importantly, the holding in *Block* is distinguishable from the present case because unlike in *Block*, Catlin had no duty to defend.[10]

Secondly, Vela's reliance on *Evanston Insurance Co. v. Atofina Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008) (affirming the rule in *Block* and distinguishing *Gandy*) is misplaced and inapplicable here. Citing *Block*, the *Evanston* Court held that Evanston's (the umbrella policy insurer) "explicit, unqualified rejection of coverage" before settlement amounted to a wrongful denial of coverage, which "surely operate[d] to trigger the equitable principles in *Block*." *Id.* at 671–72 n.60. We have already held that Catlin had no duty to defend in this case. However, despite having no duty to defend, Catlin nevertheless tendered an offer of defense to Vela, subject to a reservation of rights of letter. Vela expressly rejected that offer and proceeded to trial with his same counsel. These facts are enough to distinguish this case from *Evanston* and *Block* and render the equitable principles stated in those cases inapplicable today.

Third, Vela argues that unlike *Gandy*, no assignment of claims took place in his agreement with Williams. We disagree. Paragraphs 11 and 12 of the Vela-Williams

---

[10] We also find Vela's other pre-*Gandy* citations distinguishable because the holding in *Gandy* clarified the law with respect to whether an insurance company may be bound to a previous judgment that was obtained without a fully adversarial trial, as in this case. *See St. Paul Ins. Co. v. Rahn*, 641 S.W.2d 276 (Tex. App.—Corpus Christi 1982, no writ); *Ranger Ins. Co. v. Rogers*, 530 S.W.2d 162 (Tex. App.—Austin 1975, writ ref'd n.r.e).

20

settlement agreement expressly state the following:

11.     If [Williams] receives $125,000 from the Recovered Sum [against Catlin and/or Campos], [Williams] will assign to [Vela] [Williams's] remaining rights to payment under any judgment against [Vela] in this Case.

12.     If [Vela] in the aggregate recovers in excess of $200,000.00 from any sources, including the Recover Sum [against Catlin and/or Campos] for [Vela's] claims in This Case, the claims against [Catlin and/or Campos], or in the Subsequent Litigation, [Williams] shall be fully released of liability to [Vela].

This assignment language, when read in conjunction with the other facts of the settlement agreement and procedural posture of the case, is enough to extend the rationale and holding in *Gandy* to render such agreement invalid.   *See Gandy*, 925 S.W.2d at 714.

Accordingly, after reviewing the record, we conclude that the agreement reached by Williams and Vela has the same detrimental impact on the legal system as the agreements discussed in *Gandy* and *First General*.  The agreement in this case, subsequent bench trial, the minimal participation by Vela's counsel in the subsequent bench trial, and Vela's denial that he knew such a proceeding took place, presented a "sham of adversity" to the trial court and distorted the trial process.   *See id.* at 709.   The agreement shows that the parties agreed upon an amount of damages to be allocated between the parties for any future lawsuit against Catlin and/or Campos, in which Vela and/or Williams are parties.   This type of agreement shows no intention by the parties to end the litigation, but rather further litigation, and potentially seek excess damages against Catlin and/or Campos.   The Texas Supreme Court has expressly disapproved of such agreements as a matter of law based on public policy grounds, and we follow that reasoning today.   *See id.* at 714; *Elbaor*, 845 S.W.2d at 250; *see also First Gen.*, 981

21

S.W.2d at 500. As a result, Catlin was not bound by the Williams judgment and owed no duty to indemnify Vela.

### 3. Catlin's Liability for Campos's Conduct

Next, we consider whether Catlin can be held vicariously liable for any of Campos's conduct. Texas law does not presume agency, and the party who alleges agency has the burden of proving it. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). An insurer is generally liable for any misconduct by an agent that is within the actual or apparent scope of the agent's authority. *Lexington Ins. Co. v. Buckingham Gate, Ltd.*, 993 S.W.2d 185, 197 (Tex. App.—Corpus Christi 1999, pet. denied). In determining a principal's vicarious liability, the proper inquiry is whether the agent was acting within the scope of the agency relationship at the time of committing the act. *Id.*

Actual authority includes both express and implied authority and usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd). Apparent authority arises either from a principal knowingly permitting an agent to hold himself out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). A principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel. *Id.* To determine an agent's apparent authority we examine the conduct of the principal and the reasonableness of the third party's assumptions about

22

authority. *Id.*

Catlin argues that it cannot be held liable for any of Campos's alleged acts because Campos did not have actual or apparent authority to act on Catlin's behalf. We agree. The evidence shows that Catlin operates as a "non-admitted excess and surplus lines carrier" and its insurance distribution is handled through managing general agents—in this case, LGA. According to Catlin, "there is no relationship between Catlin and the retail agent," Campos. Campos confirmed these facts by testifying that he has no direct relationship with Catlin, deals directly with LGA, and has no authority to change any aspect of an insured's policy. Furthermore, Campos's brokerage agreement with LGA shows that Campos has "no authority to bind coverage without specific authorization from [LGA]" nor can Campos "endorse, amend or alter policies on behalf of [LGA or Catlin] without permission to do so in writing." Finally, while Vela references section 4001.052 of the insurance code,[11] in determining actual or apparent authority, we look to the principal's actions and what authority, if any, was conferred to the agent. *See Fryer*, 227 S.W.3d at 352; *Gaines*, 235 S.W.3d at 182. Here, the evidence shows that Catlin had no direct contact with Campos, and Campos dealt only with LGA, which, in turn, dealt with Catlin. Campos had no actual or apparent authority to bind Catlin. Vela produced no evidence to the contrary. Therefore, we hold that Vela did not carry his burden to establish an agency relationship between Catlin and Campos, and Catlin is not liable for any of Campos's alleged actions.

---

[11] Section 4001.052 of the Texas Insurance Code states that: "A person who solicits an application for life, accident, or health insurance or property or casualty insurance is considered the agent of the insurer issuing a policy on the application and not the agent of the insured in any controversy between the insurer and the insured, the insured's beneficiary, or the insured's dependents." TEX. INS. CODE ANN. § 4001.052(a).

23

### 4. Vela's Claim Against Catlin for Negligent Claim Handling

Next, Vela argues that the trial court erred in granting summary judgment in Catlin's favor because Catlin is liable for its handling of his claim under the *Stowers* doctrine. *See Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved). We disagree. *Stowers* imposes a common law duty on an insurer to protect an insured by accepting a reasonable settlement offer within policy limits from a third party's demands. *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 776 (Tex. 2007). The facts of this case, and the nature of the underlying proceedings do not relate to a *Stowers* duty. Accordingly, we conclude that this claim fails as a matter of law.

### 5. Campos's Liability

Vela also contends by several arguments that the trial court erred in granting Campos's motion for summary judgment. We will examine each accordingly. First, Vela alleged that Campos failed to disclose and explain the terms of Vela's insurance policy. This Court has previously recognized that other courts have held that an insurance agent does not have a legal duty to explain the terms and conditions of an insurance policy. *See Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 467–68 (Tex. App.—Corpus Christi 2008, pet. denied) (internal citations omitted). Vela cites to various cases, without further explanation or application of law to facts, to lend support to his argument calling upon this Court to recognize such a duty; however, even if we were to accept Vela's invitation to recognize an insurance agent's duty to disclose and explain the terms of a policy, Vela fails to adequately brief the issue as to how those cases apply to the present set of facts in order to permit us to make such a conclusion. *See* TEX. R.

24

APP. P. 38.1(i). Therefore, for this reason, we conclude that Vela's action against Campos for failure to disclose and explain the terms of his insurance policy fails as a matter of law.

Next, Vela argues that Campos is liable for providing him with an erroneous certificate of insurance and making "other specific verbal representations" that the policy satisfied the requirements to begin work on the Kohl's project. However, we agree with Campos's argument that providing an erroneous certificate of insurance is not actionable. In Texas, an insurance policy is a contract entered into between the parties whereby each party becomes bound by the terms of the agreement. *Ruiz v. Gov't Employees Ins. Co.*, 4 S.W.3d 838, 841 (Tex. App.—El Paso 1999, no pet.). The certificate of insurance at issue in this case conspicuously states the following:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND, OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

The Texas Supreme Court has held that certificates of insurance serve the purpose of "acknowledging that an insurance policy has been written, and setting forth in general terms what the policy covers," and "[g]iven the numerous limitations and exclusions that often encumber [insurance policies] those who take such certificates at face value do so at their own risk." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006). With this principle in mind, we are unpersuaded by Vela's argument that such an allegation is actionable because the policy is what binds the parties, not the certificate of insurance. *See Ruiz*, 4 S.W.3d at 841. Accordingly, we conclude that Vela's allegations are not actionable as a matter of law.

25

Third, Vela argues that Campos forged his signature on his premium financing application. Campos counters this argument by referring us to section 651.151 of the insurance code, which states the following:

> (b) A premium finance agreement must be dated and signed by the insured. An agreement may be signed on behalf of the insured by the insured's agent if:
>
> (1) the agreement contains policies for other than personal, family, or household purposes; and
>
> (2) the premiums for the policies exceed $1,000.

TEX. INS. CODE ANN. § 651.151(b) (West, Westlaw through 2013 3d C.S.). Campos argues in his motion for summary judgment that this provision is applicable to Vela's agreement and renders his argument invalid as a matter of law. Again, we agree with Campos.

Under the insurance code, a premium finance agreement must contain the following: (1) the name and business address of the insurance agent or broker negotiating the related insurance contract; (2) the name and residence or business address of the insured as specified by the insured; (3) the name and business location of the insurance premium finance company to which payments are to be made; (4) a description of each insurance contract involved; (5) the amount of the premium for each insurance contract; (6) the total amount of the premiums for all insurance contracts; (7) the amount of any down payment; (8) the principal balance, which is the difference between the amounts under subdivisions (6) and (7); (9) the total amount of the finance charge, which must describe each amount included and use the term "finance charge"; and (10) the balance payable by the insured, which is the sum of the amounts under subdivisions (8) and (9).

26

*Id.* § 651.151(c) (West, Westlaw through 2013 3d C.S.). A review of the record reveals that the agreement at issue in this case meets each of the statutory requirements for it to constitute a premium finance agreement. Furthermore, the agreement involves policies for Vela's business—that is, a policy other than personal, family, or household purposes, and the premiums for the policies exceeded $1,000. *See id.* § 651.151(b). As such, we conclude that Vela's argument and claim for forgery against Campos fails as a matter of law.

Lastly, Vela essentially makes the same argument against Campos as he did against Catlin to hold Campos liable for failing to indemnify him for the Williams judgment. However, as explained previously, a duty to indemnify arises out of a liability insurance policy and is assumed by the insurer, not the insurance agent. *See D.R. Horton*, 300 S.W.3d at 744. Accordingly, this claim fails as a matter of law.

### 6. Vela's Claim for Mental Anguish

As a final argument, Vela argues that the trial court erred in dismissing his claim for mental anguish on no-evidence grounds by granting Catlin and Campos's motion for summary judgment. However, since we have already concluded that summary judgment was proper on all of Vela's claims, this issue is moot, and we overrule it. *See* TEX. R. APP. P. 47.4.

### 7. Summary

To summarize, we hold: (1) Catlin owed Vela no duty to defend; (2) Catlin owed Vela no duty to indemnify; (3) Campos did not have actual or apparent authority to act as Catlin's agent and make Catlin vicariously liable for Campos's alleged actions; (4) Vela's claim against Catlin for negligent claim handling fails as a matter of law; (5) all of Vela's

27

claims against Campos fail as a matter of law; and (6) Vela's issue regarding mental anguish damages is moot because we have concluded that summary judgment was proper on all of Vela's claims. Thus, all of Vela's issues on appeal are overruled.

### III. CATLIN'S CROSS APPEAL FOR ATTORNEYS' FEES AND COSTS[12]

On cross-appeal, Catlin asserts by two issues that the trial court: (1) abused its discretion in denying Catlin's request for attorneys' fees; and (2) erred in denying Catlin's request to award costs in its favor. We will address each in turn.

### A. Attorneys' Fees

By its first issue, Catlin argues that because Vela's and Williams' claims were "indisputably groundless and maintained in blatant bad faith," it is entitled to an award of statutorily-mandated attorneys' fees.

#### 1. Standard of Review and Applicable Law

Section 541.153 of the insurance code provides for the following:

> A court shall award to the defendant court costs and reasonable and necessary attorney's fees if the court finds that an action under this subchapter is groundless and brought in bad faith or brought for the purpose of harassment.

TEX. INS. CODE ANN. § 541.153 (West, Westlaw through 2013 3d C.S.). Section 17.50(c) of the business and commerce code states the following:

> On a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs.

TEX. BUS. & COM. CODE ANN. § 17.50(c) (West, Westlaw through 2013 3d C.S.).

"Groundless" has the same meaning as groundless under Rule 13 of the Texas

---

[12] Neither Williams nor Campos filed a brief related to Catlin's cross appeal.

28

Rules of Civil Procedure—that is, "'[n]o basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.'" *See Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989) (quoting TEX. R. CIV. P. 13). Questions of whether an action is groundless, brought in bad faith, or brought for the purpose of harassment are reserved solely for the court, according to the plain words of each statute. *See id.* Appellate review of such determinations is a question of law under an abuse of discretion standard. *Id.* n.3. A trial court abuses its discretion if the trial court acts without reference to guiding rules and principles, or acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242.

## 2. Discussion

Catlin asserts that Vela's and Williams's claims brought under the insurance code and Deceptive Trade Practices Act (DTPA) were groundless and/or brought in bad faith.

### a. Whether Vela's claims were groundless

The record shows that Vela essentially filed suit against Catlin believing that the claims by Williams—and ultimately the judgment entered against him—were covered losses in the policy that triggered Catlin's duty to defend. While the ultimate disposition of Vela's claims against Catlin was decided as a matter of law, the decisions turned upon an appropriate review and evaluation of the allegations made and evidence presented, arguments presented by counsel, and interpretation of the policy at issue. We recognize that the holding in *Nwaigwe v. Prudential Property & Casualty Ins. Co.*, 27 S.W.3d 558,

560–61 (Tex. App.—San Antonio 2000, pet. denied), as relied upon by Catlin, states that "mistaken belief about the scope or availability of coverage is not actionable under the DTPA or insurance code," but we decline to read the *Nwaigwe* holding further to broadly conclude that any plaintiff who brings such an unrecognized action does so groundlessly. Furthermore, while Vela arguably acknowledged that subsidence was present in a discovery response to Williams[13] during the Kohl's project litigation, Vela's ultimately unsuccessful arguments in its lawsuit (and again on appeal) against Catlin asserted that the subsidence exclusion did not apply to the facts of this case. Catlin further argues that Vela had "no basis to seek any damages against Catlin" because the core of Vela's alleged damages against Catlin related to the Williams judgment against him. However, as held previously, Catlin's lack of duties as a matter of law turned upon contract interpretation. For these reasons, we cannot conclude that the trial court abused its discretion in concluding that Vela's claims and arguments were not groundless. *See Donwerth*, 775 S.W.2d at 637.

### b. Whether Williams's claims were groundless

Catlin also asserts that Williams's claims against it were "blatantly groundless." In Williams's fifth amended plea in intervention, Williams sued Catlin for violations of the Texas Insurance Code and DTPA, including: (1) representing that the insurance policy

---

[13] The interrogatory at issue asked the following: "State the facts upon which you rely in claiming or would seek to prove that '[Williams] improperly tested and/or improperly approved the condition of the parking lot subsurface prior to paving' in paragraph 18 of Plaintiff's Fourth Amended Petition." Vela provided the following qualified response:

Plaintiff has not completed discovery regarding the subject of this interrogatory, and will supplement this response. At this time, Plaintiff's understanding is that the subject parking lot failed because of subsidence of the soil beneath the asphalt, and that that subsidence would not have resulted with proper soil testing and associated additional soil placement and compaction.

30

conferred or involved rights or obligations that it did not; (2) making untrue statements of material fact; (3) failing to state facts necessary to make other statements not misleading; (4) making statements in a manner that would mislead a reasonable person; (5) disseminating false information with respect to the insurance business; (6) representing that Catlin's services had benefits or characteristics that they did not possess; (7) engaging in unconscionable actions or courses of action, among other unfair insurance practices and deceptive trade practices as evidenced by, among other things, the certificate of insurance issued to Williams in connection with the making of or consummating the insurance contract with Williams on or about June 27, 2007.

Although we held previously in this opinion that issuance of an erroneous certificate of insurance is not actionable in Texas, *see TIG Ins. Co.*, 211 S.W.3d at 314, we decline to hold that the trial court abused its discretion in declining to award Catlin attorney's fees simply because such a claim is not actionable in Texas. The trial court could have reasonably concluded that Williams did not bring a groundless claim under an incorrect theory of law pursuant to the DTPA and/or insurance code because Williams made a good faith argument to support his contention based upon the facts of this case.

### c. Whether Vela's and Williams's claims were maintained in bad faith

Catlin next argues that Vela and Williams maintained their claims in bad faith due to their "sham" agreement and corresponding proceedings and judgment.

"Improper motive" is an essential element of bad faith. *See Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied) (interpreting Texas Rule of Civil Procedure 13). "Bad faith is simply not bad judgment or negligence, but means the conscious doing of a wrong for dishonest, discriminatory, or malicious purpose." *Id.*

31

First, we note that the trial court held a full evidentiary hearing, including receiving testimony from witnesses, on the issue of whether Catlin was entitled to attorneys' fees under the insurance code or DTPA following the take-nothing summary judgment issued against Vela and Williams. At the hearing, the trial court made clear on the record that its conclusion that Williams's judgment was a "sham" did not equal a finding of groundlessness or bad faith. Further, the trial court explained that the "sham" judgment holding was based upon "numerous variables," but "none of them . . . were based on any kind of implication of bad faith . . . ." While we have upheld the trial court's conclusion that the judgment was a sham, we decline to find that the trial court abused its discretion in finding that the parties did not act in bad faith based upon its evaluation of the record.

Our review of the record does not allow us to disturb the trial court's discretionary ruling because the evidence does not show a "conscious doing of a wrong for dishonest, discriminatory, or malicious purpose" by the parties. *See id.* At most, the sham proceedings and judgment show a lapse in judgment by both parties who entered into an agreement under the legally incorrect belief or conclusion that it would be beneficial to both parties because such claims were covered under the insurance policy. Finally, Williams's intervention and role in the subsequent litigation against Catlin and Campos is not enough to show bad faith, particularly in light of the *Block* case that Vela relied upon heavily in his briefing to defeat Catlin's "sham" argument. In *Block*, the Blocks, who had obtained an agreed judgment in the trial court against CSI (the underlying insured), filed a plea in intervention in CSI's lawsuit against its insurer as a judgment creditor. *See Block*, 744 S.W.2d at 942. Thus, it was reasonable for the trial court to conclude that Williams's plea in intervention was an action that was analogous or similar to the actions

32

taken by the Blocks in that case. For these reasons, we hold that the trial court did not abuse its discretion in finding that Vela and Williams did not act in bad faith. Accordingly, Catlin's first issue on cross-appeal is overruled.

## B. Costs

By its last issue on cross appeal, Catlin asserts that the trial court erred by not awarding Catlin its court costs.

### 1. Applicable Law and Standard of Review

Texas Rule of Civil Procedure 131 states that "a successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131. A defendant who obtains a take-nothing judgment is a successful party. *Imperial Lofts, Ltd. v. Imperial Woodworks, Inc.*, 245 S.W.3d 1, 8 (Tex. App.—Waco 2007, pet. denied). Taxing costs against a successful party in the trial court . . . contravenes Rule 131. *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 376 (Tex. 2001). However, a court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or the rules of civil procedure. TEX. R. CIV. P. 141.

We review a trial court's allocation of costs under an abuse of discretion standard. *Williamson v. Roberts*, 52 S.W.3d 354, 356 (Tex. App.—Texarkana 2001), *rev'd and rendered in part on other grounds and aff'd in part*, 111 S.W.3d 113, 124 (Tex. 2003). Absent a sufficient articulation on the record of good cause for adjudging costs otherwise than what Rule 131 requires amounts to an abuse of discretion. *See Furr's*, 53 S.W.3d at 378 (finding an abuse of discretion by the trial court for not awarding court costs pursuant to Rule 131 due to the losing party's "fragile emotional state").

33

## 2. Discussion

Here, Catlin obtained a take-nothing judgment against Vela and Williams. Therefore, Catlin was a "successful party" in this case. *See Imperial Lofts*, 245 S.W.3d at 8. The trial court, however, taxed costs "against the parties having incurred same." This allocation of costs contravened Rule 131. *See Furr's*, 53 S.W.3d at 376. Furthermore, the trial court did not state on the record the "good cause" for adjudging costs otherwise than provided by Rule 131. As a result, the trial court abused its discretion. Catlin's second issue on cross-appeal is sustained.

## IV. CONCLUSION

We affirm the trial court's take-nothing judgment against Vela and Williams in its entirety. We also affirm the trial court's denial of Catlin's request for attorneys' fees pursuant to the insurance code and DTPA. We reverse the trial court's allocation of costs and remand to the trial court to assess costs pursuant to Rules 131 and 141.

/s/ Gina M. Benavides
GINA M. BENAVIDES,
Justice

Delivered and filed the
16th day of April, 2015.

34